1998 ME 210

**Joan STEEVES**

v.

**BERNSTEIN, SHUR, SAWYER & NELSON, P.C. et al.[1]**

Supreme Judicial Court of Maine.

Argued May 4, 1998.
Decided Aug. 14, 1998.

---

ty of its holding to the case at bar, and the Court's reliance on *Harding* is misplaced.

1. The other defendant-appellees are Peter Rubin and Anthony Perkins, attorneys and stockholders of the law firm, generally referred to in the opinion as "Bernstein."

John S. Campbell (orally), Campbell & McArdle, P.A., Portland, for plaintiff.

Christopher C. Taintor (orally), Robert F. Hanson, Norman, Hanson & DeTroy, Portland, for defendants.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN and DANA, JJ.

CLIFFORD, Justice.

[¶ 1] Joan Steeves appeals from a summary judgment entered in the Superior Court (Cumberland County, *Mills, J.*) in favor of Bernstein, Shur, Sawyer & Nelson, P.C., and two of the firm's attorneys, in Steeves's legal malpractice action. Steeves contends that the court erred in entering a summary judgment based on the court's con-

clusion that her damages were conjectural.[2] Although Steeves has generated material issues of fact regarding an alleged breach of a professional duty owed to her, we affirm the summary judgment because Steeves has failed to show more than the mere possibility that any such breach has caused her any loss.

[¶ 2] Joan Steeves and her then-fiancé, James Swartz, bought land in Cumberland Foreside in 1986, and built a house partially financed by a loan made to them by Maine Savings Bank (MSB). Steeves and Swartz married in October of 1986, but Swartz left Steeves in 1989, releasing his interest in the property to her. At that time, Steeves was left without any ostensible source of income.[3] She stopped making mortgage payments in 1989, and MSB began a foreclosure action in February 1990, alleging $430,918.34 was owed in unpaid principal and accrued interest. Steeves listed the home for sale. Initially she asked for $1,050,000. She received one offer to purchase the property, for $290,000. In 1991 she reduced the asking price to $975,000, and in 1992 she reduced the price to $850,000 and then to $680,000, but received no written offers. The 1991 divorce judgment obligated Swartz to make monthly payments of $4,000 to Steeves. Steeves, however, did not receive any payment except during a five-month period beginning in August 1992 when she received partial payments totalling $19,000.

[¶ 3] Bernstein represented Steeves in defending the foreclosure action and asserting a counterclaim against MSB alleging that MSB breached a provision of a 1987 construction loan agreement by failing to withhold from the contractor 10% of the construction costs[4] (approximately $33,200) pending the completion of the project, to cover negligent construction work.[5] The foreclosure action was removed to federal district court. MSB moved for a summary judgment on the claim and counterclaim in 1991. While the motion was pending MSB was declared insolvent, the FDIC was appointed receiver, Fleet Bank acquired MSB's assets, and RECOLL Management Corp. (a wholly-owned subsidiary of Fleet Financial Group) was placed in charge of liquidating Steeves's mortgage.

[¶ 4] The Bernstein office represented both Fleet Bank and Steeves and consulted with Fleet to determine if a conflict of interest existed. Based on that discussion, Bernstein concluded that RECOLL, not Fleet was the real party in interest, and that there would be no conflict in representing Steeves in the foreclosure action.[6]

[¶ 5] In February of 1992 the district court granted a summary judgment to Fleet and entered a judgment of foreclosure and sale, holding that the *D'Oench, Duhme* doctrine[7] applied to assignees of the FDIC,

---

2. Steeves also contends that the court erred and abused its discretion by imposing a sanction against her. *See infra* note 9.

3. Swartz moved to Florida and filed for bankruptcy protection. As of 1996 Steeves was unsuccessfully attempting to enforce a substantial divorce judgment requiring him to pay alimony and his obligation on the mortgage debt.

4. The retainage provision in the Construction loan agreement executed by Steeves, MSB, and IBIS Construction Company provided:

   The remaining 10% of the loan shall be withheld pending final completion.... The Mortgagee, *at its discretion,* may waive said 10% retainage upon any periodic inspection.
   The document further provided:
   It is also agreed that Borrower shall have no right to rely on any procedures required by Mortgagee herein, *such procedures being for the protection of the Mortgagee as lender and no one else.*
   (Emphases added).

5. Steeves's had a claim for defective workmanship against the insolvent contractor in excess of the 10% retainage amount.

6. Steeves was not told of the possible conflict until after the foreclosure sale of her home. Bernstein told her they could not represent her if she wanted to sue Fleet or RECOLL.

7. *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (U.S.1942). Pursuant to the *D'Oench, Duhme* doctrine, defendants are precluded from using secret or unrecorded side agreements to defend against efforts by the FDIC to collect on notes acquired from a failed bank. Accordingly, Steeve's defense and counterclaim based on MSB's alleged breach of the construction loan agreement by not withholding money from the contractor, failed. The district court also noted that the *D'Oench, Duhme* doctrine is no longer strictly common law, having been incorporated into the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").

including private parties such as Fleet. *See Fleet Bank of Maine v. Steeves,* 785 F.Supp. 209, 215 (D.Me.1992). Because the construction loan agreement was not incorporated into the mortgage notes, and because there was no written agreement stating that the mortgage loans could not be enforced if a breach of the construction agreement occurred, Steeves's defense and counterclaim based on an alleged breach of the construction loan agreement were barred. The amount of the judgment entered in favor of Fleet against Steeves was $495,854.84. The amount of interest accruing on the two notes was $91.47 per day, or $33,386.55 annually.

[¶ 6] Bernstein informed Steeves that she had 90 days to redeem the property, after which the bank would own it. Neither an appeal nor a bankruptcy filing were pursued on behalf of Steeves. RECOLL and Steeves, and Bernstein on Steeves's behalf, exchanged proposals between April and September of 1992, in which Steeves sought alternatives to a foreclosure sale whereby she might live in the house for a longer period and aggressively market it at a price that would satisfy her mortgage debt and leave her with some equity. No definite proposal was agreed to.

[¶ 7] By September of 1992, RECOLL had obtained a writ of possession of the property and published notice of a foreclosure sale of the property to take place on October 15, 1992. In the meantime, Steeves had begun discussions with an acquaintance, Hal O'Brien, counsel for French Broad Acquisitions (FBA), a North Carolina corporation that expressed interest in bidding on the property and allowing Steeves to live in the property temporarily, with proceeds of an eventual sale to be divided between FBA and Steeves.

[¶ 8] On September 24, 1992, FBA contracted with Steeves to either bid for the property at auction or purchase it from RECOLL or Fleet at a price of $425,000, with the understanding that after the expenses and principal were paid, any future surplus

sale proceeds would be split between Steeves and FBA. The agreement provided:

> French Broad shall bid on said real estate up to a price of $425,000 plus expenses at the auction scheduled October 15, 1992, or in the event that Fleet ... or its agent, RECOLL ..., acquires title to the real estate ... the parties shall offer $425,000 plus expenses for the purchase of the subject property.

The agreement did not condition FBA's obligations to secure financing and make its bid on the existence of a specified amount of time before the closing.

[¶ 9] Shortly before the auction, Steeves heard from her daughter-in-law's sister's husband, who had spoken with a friend who was a vice-president at Fleet, that the bidding at the auction of the property was going to start at $600,000. Based on this, she called O'Brien and told him not to attend the auction. O'Brien "offered to come up" anyway despite being told not to. She later testified that she told him not to come because he needed 60 days to arrange financing and close, and that the terms of the auction provided for only 45 days before closing. The property sold at auction for $395,000. The total of the judgment, costs, and attorney fees documented in Fleet's report of sale totalled $563,721.05, resulting in a deficiency judgment against Steeves.

[¶ 10] In filing this professional malpractice action against Bernstein, Steeves alleges Bernstein committed legal malpractice by: (1) failing to disclose a conflict of interest, (2) not advising her to appeal the judgment of foreclosure, (3) not advising her as to the benefits of a Chapter 11 bankruptcy filing, and (4) failing to respond adequately to RECOLL offers during workout discussions that would have become enforceable agreements.[8] Steeves contends that Bernstein's failure to advise her of her options caused her a loss when she was unable to defer the auction of her home to a time when she would have realized a greater sale price. The Superior Court granted Bernstein's motion for a sum-

---

8. Steeves alleges breaches of fiduciary duty, negligence, and breach of contract. *See Kilpatrick v. Wiley, Rein & Fielding,* 909 P.2d 1283, 1291 n. 2 (Utah App.1996) (generally the same rules of causation apply whether the cause of action sounds in contract, negligence, or breach of fiduciary duty) (citing 1 R. Mallen & J. Smith, *Legal Malpractice* 8.3, at 413 (3d ed.1989)).

mary judgment,[9] and Steeves filed this appeal.

[¶ 11] We review the Superior Court's entry of summary judgment "for errors of law, viewing the evidence in the light most favorable to the party against whom the judgment was entered." *Denman v. Peoples Heritage Bank, Inc.*, 1998 ME 12, ¶ 3, 704 A.2d 411, 413. A summary judgment will be upheld "if the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* The "plaintiff must establish a prima facie case for each element of his cause of action." *Barnes v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995). "The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question before the court is solely one of law." *Bouchard v. American Orthodontics*, 661 A.2d 1143, 1144 (Me.1995).

[¶ 12] In a professional negligence action, "the plaintiff must establish that the defendant had a duty to the plaintiff to conform to a certain standard of conduct and that a breach of that duty proximately caused injury to the plaintiff." *Fisherman's Wharf Associates II v. Verrill & Dana*, 645 A.2d 1133, 1136 (Me.1994) (attorney malpractice). In *Spickler v. York*, 566 A.2d 1385, 1390 (Me.1989), we noted that "more than a mere possibility that [the defendant attorney's] negligence, if any, might have caused [the plaintiff's] loss of the . . . action is neces-

sary to establish that [the] conduct was the proximate cause of [the plaintiff's] loss."

[¶ 13] In general, "judgment as a matter of law in a defendant's favor is appropriate when any jury verdict for the plaintiff would be based on conjecture or speculation." *Fleming v. Gardner*, 658 A.2d 1074, 1076 (Me.1995). It is appropriate for a trial court to keep highly speculative causation issues from the jury in a legal malpractice case. See *id.* at 1077 (*reversing* denial of attorney's motion for summary judgment in malpractice action on the basis that record was "bare of evidence" that injury to client was caused by improper representation). Because "a mere possibility" of success, *Spickler v. York*, 566 A.2d at 1390, is insufficient to establish legal malpractice, a summary judgment in favor of the defendant is appropriate when the link between the attorney's act or omission and the alleged damage is overly speculative.

### I.

[¶ 14] Steeves contends that Bernstein's failure to advise her to appeal the foreclosure judgment constitutes malpractice. Although Steeves has generated a factual issue as to whether Bernstein should have advised her of her rights of appeal, she has not shown any resulting damage. The trial court correctly concluded that she would not have prevailed on appeal.

### A.

[¶ 15] Steeves contends that the issue of her theoretical appeal should have been determined by a jury. In an action

---

9. In its reply brief supporting its motion for summary judgment, Bernstein cited violations of M.R. Civ. P. 7(d)(2) and M.R. Civ. P. 56(e) in Steeves's statement of material facts, and respectfully submit[ted] that the Court should strike the Plaintiff's rule 7(d)(2) Statement in its entirety. The court concluded in its summary judgment order that Steeves's statement of material facts was "replete with inaccurate or missing record references, legal argument, and lack of care for the process," and, noting violations of M.R. Civ. P. 7(d), 11, and 56(c) and (e), ordered Bernstein to submit an affidavit of costs and attorneys fees associated with preparation of its reply memorandum supporting its motion for summary judgment. The court later entered an order for Steeves to reimburse Bernstein for its documented $2,365.50 in costs and attorney fees.

Steeves argues that the sanction order was "erroneous," because her attorney's acts were not in bad faith or egregious, the court did not "set forth specifically" the rationale for its sanction, and the court "should have notified counsel and allowed him to explain the factual basis for the particular paragraph."

A trial court's imposition of sanctions is reviewed for an abuse of discretion, and in this case the court acted within its discretion. *See Fraser Employees Fed. Credit Union v. Labbe*, 1998 ME 71, ¶ 8, 708 A.2d 1027, 1030 (1998) ("court acted well within the bounds of its broad discretion" by imposing a $1,200 Rule 11 sanction where many of party's affirmative defenses and counterclaims lacked supporting evidence).

following an attorney error during trial, the court addressing the causation issue in the subsequent malpractice action "merely retries, or tries for the first time, the client's cause of action which the client asserts was lost or compromised by the attorney's negligence." *Daugert v. Pappas,* 104 Wash.2d 254, 704 P.2d 600, 603 (Wash.1985). By contrast, in an attorney's alleged failure to perfect an appeal, the client must show that an appellate court would have granted review and rendered a judgment more favorable to the client. Numerous courts[10] have recognized that the determination of whether an appeal not taken would have succeeded is "within the exclusive province of the court, not the jury...." *See id.* ("determination of what decision would have followed if the attorney had timely filed the petition for review is a question of law for the judge, irrespective of whether the facts are undisputed."); *see also Charles Reinhart Co. v. Winiemko,* 444 Mich. 579, 513 N.W.2d 773, 779 (Mich.1994) (issue of whether an appeal would have been successful involves issues of law within the exclusive province of the courts); *Chocktoot v. Smith,* 280 Or. 567, 571 P.2d 1255, 1258 (Or.1977) ("[N]o jury can reach its own judgment on the proper outcome of an earlier case that hinged on an issue of law. Unlike its decision of a disputed issue of the professional standard of care, the jury cannot decide a disputed issue of law on the testimony of lawyers."). Contrary to Steeves's contention, the issue concerning the failure to appeal the foreclosure to the First Circuit is a question of law that was properly addressed by the court at the time of summary judgment.

## B.

[¶ 16] The appeal of a similar foreclosure judgment of the federal district court in 1992 demonstrates the correctness of the Superior Court's conclusion that an appeal of the foreclosure judgment by Steeves would have

been unsuccessful. *See Fleet Bank of Maine v. Prawer,* 991 F.2d 786 (1st Cir.1993) (unpublished opinion). The Prawers, like Steeves, were asserting the same type of affirmative defense and counterclaim, arguing that the bank's failure to abide by the terms of two letters offering financing that predated two promissory notes excused some of the Prawers' liability on the mortgages that secured the debt on the notes. The appeal of the Prawers, very similar to the appeal Steeves contends should have been taken on her behalf, was rejected by the First Circuit on state law grounds. The court concluded that the unambiguous terms of the promissory notes offered "no hint" that repayment on the notes would be affected by any other agreement. An appeal by Steeves would have fallen squarely under the First Circuit's holding in Prawer that pursuant to Maine law, unambiguous repayment terms within the four corners of the notes prevent the counterclaimant from relying on other agreements and from introducing extrinsic evidence. Steeves points to nothing in the record that shows that the notes in the foreclosure judgment against her were conditioned by the construction loan agreement. Indeed, in her statement of material facts in dispute, Steeves merely offers her subjective and undocumented "understanding" that the Bank would not waive the retainage provision without obtaining her consent. Even if an appeal in federal court were not barred pursuant to federal law and the *D'Oench, Duhme* doctrine, because the claim would fail on state law grounds, Steeves's assertion that she was damaged by the failure of Bernstein to appeal the foreclosure is without merit.

## II.

[¶ 17] Steeves also contends that Bernstein's failure to advise her of the option of a filing under chapter 11 of the Bankruptcy Code, with the extra time and protection that the automatic stay[11] would have al-

10. *See, e.g., Chocktoot v. Smith,* 280 Or. 567, 571 P.2d 1255 (Or.1977); *Hurd v. DiMento & Sullivan,* 440 F.2d 1322 (1st Cir.1971); *Croce v. Sanchez,* 256 Cal.App.2d 680, 64 Cal.Rptr. 448 (Cal. App.2d 1967); *Chicago Red Top Cab Ass'n, Inc. v. Gaines,* 49 Ill.App.3d 332, 7 Ill.Dec. 167, 364 N.E.2d 328 (Ill.App.1977); *Cabot, Cabot & Forbes Co. v. Brian, Simon, Peragine, Smith &*

*Redfearn,* 568 F.Supp. 371 (E.D.La.1983); *Katsaris v. Scelsi,* 115 Misc.2d 115, 453 N.Y.S.2d 994 (N.Y.Sup.Ct.1982).

11. *See* 11 U.S.C.A. § 362 Revision Notes and Legislative Reports, 1978 Acts ("The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the

lowed, cost her the opportunity of retaining her house long enough to find a buyer at a greater price than that realized at the foreclosure sale. Steeves also contends, as she did on the issue of the appeal, that the determination of the extent that such a bankruptcy petition would have protected her should have been made by a jury. We disagree.

### A.

[¶ 18]   In *Harline v. Barker*, 912 P.2d 433, 440 (Utah 1996), the Utah court reviewing alleged attorney negligence in preparing bankruptcy forms reasoned:

> We see no reason why a malpractice plaintiff should be able to bootstrap his way into having a lay jury decide the merits of the underlying "suit within a suit" when, by statute or other rule of law, only an expert judge could have made the underlying decision. It is illogical, in effect, to make a change in the law's allocation of responsibility between judge and jury in the underlying action.... Rather, it makes far more practical sense to apply the rule that if the underlying case could only have been tried by a judge, then this aspect of the malpractice claim—the suit within the suit—must likewise be tried by a judge.

*Id.* We similarly conclude that there is no logical role for the jury in these circumstances.

### B.

[¶ 19]   The bankruptcy Code makes clear that Steeves was not eligible for an advantageous discharge in bankruptcy. Moreover, Steeves failed to produce evidence of any increase in the market value of her property during the time that Steeves would have been protected by a bankruptcy stay. The mere chance that Steeves would have been able to sell her house profitably during the temporary bankruptcy stay was too speculative to preclude the entry of a summary judgment against her.

[¶ 20]   Steeves points out that a filing before the February 1992 foreclosure judgment would have delayed the running of the 90–day redemption period until after any relief from stay was granted by the bankruptcy court. Such a chapter 11 filing, however, would have been vulnerable to dismissal for cause pursuant to 11 U.S.C.A. § 1112(b).[12] *See In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir.1983) ("[A] chapter 11 reorganization plan must be submitted in good faith.... That is to say, there must be some relation—at least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that the chapter was designed to serve."). Petitions filed "for reasons inconsistent with the intended purpose of the reorganization chapter" include a plan for "litigation not reorganization," a filing that was in fact a "share holders squabble," and one that was merely a "two-party lawsuit." *In re Sullivan Cty. Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 81 (Bankr.D.N.H. 1994) (citing cases).

[¶ 21]   Although a "single asset debtor is not automatically disqualified from filing a chapter 11 case to stop a pending foreclosure, ... single asset bankruptcy filings are common points for focus of bad faith filing analysis because they often appear to present merely two-party disputes and frequently entail little likelihood that a debtor operating a single asset can effectively reorganize."

debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.").

**12.**  Title 11 U.S.C.A. § 1112(b) provides in pertinent part:

> [O]n request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, *for cause, including—*
> (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
> (2) inability to effectuate a plan;
> (3) unreasonable delay by the debtor that is prejudicial to creditors;
> (4) failure to propose a plan under section 1121 of this title within any time fixed by the court ....

*Id.* (emphasis added).

Raymond T. Nimmer & Millie Aponte Sall, *The Law of Distressed Real Estate: Foreclosure, Workouts, Procedures* § 24B.03 (1997). Such filings are vulnerable to dismissal. *See Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir.1986).

[¶ 22] Dismissal for cause based on lack of good faith commonly results from a recognition that the debtor is interposing a chapter 11 filing to frustrate a single, secured creditor, premised upon a slight chance of a renewed cash flow with the passage of time. In *In re Walter*, 108 B.R. 244 (Bankr. C.D.Cal.1989), for example, the bankruptcy court dismissed on bad faith grounds a petition filed by a debtor whose single-asset real estate was subject to the claim of its sole secured creditor who was attempting to foreclose. Failing either to negotiate terms with the creditor or to defeat the foreclosure in state court, the debtors tried to stop the foreclosure in bankruptcy court by use of the automatic stay. The court dismissed the case, concluding that the bankruptcy filing was "at bottom forum shopping." *Id.* at 250; *see also In re Trina Assocs.*, 128 B.R. 858, 872 (Bankr.E.D.N.Y.1991) (dismissing petition for bad faith because "it is recognized that seeking the protection of the automatic stay to derail a foreclosure is only appropriate when the Debtor intends to and has the wherewithal to reorganize").

[¶ 23] Steeves argues that a chapter 11 filing was critical to provide her with a bargaining position to prevail in the failing negotiations with RECOLL in 1992. Such a motivation has been grounds for a bad faith dismissal when various defenses in over a year of litigation in state court had been unfruitful. *See In re Campus Housing Developers, Inc.*, 124 B.R. 867, 870 (Bankr. N.D.Fla.1991) ("When [the debtor] lost in the state court, it filed for the protection of the Bankruptcy Code in an attempt to force RTC to refinance the loan on terms which it could not negotiate.... The bankruptcy court was not intended to provide debtors

with an alternate forum for private disputes.").

[¶ 24] Steeves does not address what her "reorganization" would consist of, aside from her purported ability to salvage her lost equity with the passage of time and her hope that the real estate market would improve. This, too, is grounds for a dismissal based on bad faith. *See* Nimmer & Sall, *supra,* § 24B.03 ("Bad faith exists if a debtor files its petition without an ability or reasonable expectation of reorganization."); *see also In re Nesenkeag, Inc.*, 131 B.R. 246, 249 (Bankr.D.N.H. 1991) ("This is simply a 'two-party lawsuit' which has been transferred from the state courts to this court under the guise of a 'reorganization' that amounts to nothing more than further delay during which the equity-holders hope to salvage their investment. No other parties are involved and no need for 'reorganization' in any meaningful sense pertinent to the Bankruptcy Code is shown."); *In re Miracle Church of God in Christ,* 119 B.R. 308, 310 (Bankr.M.D.Fla. 1990) ("Lack of good faith is clearly shown by evidence of a debtor seeking to use the provisions of the Bankruptcy Code in order to hold a single asset 'hostage' in order to speculate that such asset may increase in value in order to recover its original value at the creditors's risk."); *In re Krilich,* 87 B.R. 178, 183 (Bankr.M.D.Fla.1988) ("Thus if a Debtor's problem is nothing but a mortgage which is in default which has been foreclosed, and the Chapter 11 is filed for the sole purpose of stalling and preventing the sale of the property at foreclosure in the hope and expectation that the property might increase in value and hopefully might create an equity for the owners, it is a petition which was not filed in good faith."). *See also In re Sirius Systems, Inc.,* 112 B.R. 50, 55 (Bankr.D.N.H.1990).

### C.

[¶ 25] Moreover, had Steeves's filing not been dismissed for cause, Fleet would have been entitled to a relief from stay. *See* Bankruptcy Code Section 362(d)[13] (stating

**13.** Title 11 U.S.C.A. § 362(d) provides in pertinent part:
> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection

> (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

when lender is entitled to relief from the automatic stay). To resist a relief from stay, the debtor who does not have equity in property must not only show that it is essential or indispensable to the reorganization,[14] *In re Turner,* 161 B.R. 1, 4 (Bankr.D.Me.1993); she must further prove that the planned reorganization is "feasible." *Id.* "[T]here must be a reasonable possibility of a successful reorganization within a reasonable time." *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365, 375–76, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

[¶ 26] At the time Steeves argues that she could and should have been filing for chapter 11, e.g., in the early part of 1992 before the judgment of foreclosure, her equity was essentially non-existent and her prospects for a successful reorganization were very bleak. Lack of equity "exists if the value of the collateral is less than the first lien or less than the sum of all liens against the property." Nimmer & Sall, *supra,* at § 24B.03. The two concrete valuations in the record were for $465,000 and $507,000. The total amount due on the debt to Fleet as of the summary judgment in 1992 was $495,-854.84, and interest was accruing at an annual rate of $33,386.55.

[¶ 27] Moreover, at that point, although her divorce judgment provided that her ex-husband pay her $4,000 per month in alimony, and made him responsible for marital debt, she had collected little. The speculative nature of this alleged future income stream would give Steeves little help in meeting her burden pursuant to 11 U.S.C. § 362(d)(2)(B) to show that the reorganization was feasible. *See In re Petit,* 176 B.R. 296, 297 n. 3 (Bankr.D.Me.1995) (no effective reorganization was in prospect where a critical payment was to be funded by expected litigation proceeds, "if and when they are received"). Accordingly, Steeves had little

or no equity in the property and an effective reorganization was not in prospect. Bernstein's failure to advise Steeves of the option of filing for bankruptcy protection did not result in any discernible damages so as to preclude the entry of a summary judgment.

### III.

[¶ 28] Steeves's contention that additional time would have allowed FBA the opportunity to secure financing for her real estate is without merit. The record reflects that Steeves, not the law firm, was responsible for relieving FBA from its obligation to secure financing and bid at the foreclosure sale. Steeves explicitly told O'Brien not to attend that sale. Steeves contends that FBA was not contractually obligated to appear at the auction. The Steeves–FBA contract, however, clearly reflects the contrary. Notwithstanding Steeves's professed belief that FBA would not have had sufficient time to arrange financing, FBA was legally bound to secure financing and make a bid on the property, and Steeves relieved it of any obligation that it had.

[¶ 29] The lack of proof of any damage beyond speculation is fatal to Steeves's other contentions as well. Steeves had generated an issue of material fact as to whether Bernstein should have disclosed to her the possible conflict of interest Bernstein had in defending her in the foreclosure action brought by Fleet. She fails, however, to generate anything beyond speculation as to how she was damaged. She had no legitimate defense to the foreclosure, and she has failed to show how an appeal or bankruptcy filing or any other delay would have appreciably improved her position. She presented no evidence as to any change in the value of her real estate during the relevant period when she asserts that more time would have

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
(2) with respect to a stay of an act against property under subsection (a) of this section, if—
    (A) the debtor does not have an equity in such property; and
    (B) such property is not necessary to an effective reorganization

14. Steeves's "need to use the asset" was dubious and thus grounds for relief from stay for cause pursuant to 11 U.S.C. § 362(d)(1). *See* Nimmer & Sall, *supra,* at § 24B.03 ("The debtor must prove that the property is necessary for an effective reorganization if it has no equity in the property, but proof of a need to continue to use the asset is also important *even if equity exists* since it relates to the general "cause" standard for relief from the stay.") (emphasis added).

allowed her to realize a higher price. The court correctly concluded that "plaintiff's belief that she could have found the right buyer and sold the house pending any possible stay of foreclosure that she could have obtained is pure speculation." *See Girardi v. Gabriel*, 38 Mass.App.Ct. 553, 649 N.E.2d 805, 809 (Mass.App.1995) (no "basis for attributing the adverse consequences of the fall in real estate prices to the [attorneys'] negligence when plaintiff's expert initially stated that the delay in administering the estate contributed to the risk of loss in a falling real estate market [but then] conceded that he could not say that the delay caused any damages.").

[¶ 30] Finally, the court did not err in rejecting Steeves's contention that Bernstein dawdled in the spring and summer of 1992, and did not act promptly to secure an agreement with RECOLL to allow her to remain in the possession of her property and to market the property. She contends that Bernstein's failure to respond promptly to RECOLL proposals allowed Fleet to avoid what would have been enforceable agreements. That the outcome would have been any more beneficial for Steeves if Bernstein had sought to buy her additional time through an appeal, or a chapter 11 filing, or if the firm had responded differently to RE-COLL's proposals, is merely conjecture, and insufficient to resist the summary judgment entered.

[¶ 31] Other issues raised by Steeves are without merit.[15]

The entry is:

Judgment affirmed.

---

15. Steeves also alleges that she suffered emotional distress caused by Bernstein. Although Steeves may have generated a genuine issue of material fact regarding the existence of emotional distress following the loss of her home, her claim fails because of the conjectural nature of the causation between any acts of Bernstein and the loss of her home.