ENTERED NOV 2 0 2014
*append.*

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-12-161
*JI 23/2014*
NM-CUM-05-23-14

BONNIE ALLEN,

    Plaintiff

v.

ALEXANDER F. MCCANN,

    Defendant

ORDER ON MOTION
TO ALTER OR
AMEND JUDGMENT

Before the Court is plaintiff's motion to alter or amend judgment. Plaintiff argues that the Court erred in granting defendant's motion for summary judgment because she raised an issue of fact with regard to whether she would have received total incapacity benefits but for defendant's negligence and with regard to Social Security benefits.

Plaintiff argues that the independent medical examiner, Dr. Bridgman, testified that plaintiff's work capacity was limited to four hours per day. (Add. S.M.F. ¶ 6.) Plaintiff misstates Dr. Bridgman's testimony. In response to a question about whether the plaintiff could perform a specific job, Dr. Bridgman stated:

> Well, yes, I don't know if she would be able to do the eight hours for the first day. It might have to be four hours, you know, for a while, then six hours, then eight hours, depending on her learning. This is not something that has to be done by a licensed chemist, you get trained to do it.

(Bridgman Dep. 12:14-19.)[1] He never limited plaintiff to part-time work.

---

[1] Although not cited in the statements of fact, that opinion appears again in his report: "It is possible that with some restrictions, and some attention to ergonomics, that she would be able to do that job. Obviously, it might have to start part-time and then work up to the full eight hour day." (Bridgman Report at 13.)

Plaintiff relies on Lelievre v. Pitt Construction, Inc. to argue that Dr. Bridgman's testimony about working up to eight hours per day is not probative. In that case, the issue was whether there was any competent evidence in the record to support the commission's finding that the employee had fully recovered his work capacity on 11/6/79. Lelievre v. Pitt Constr., Inc., 437 A.2d 636, 638 (Me. 1981). The Court held that testimony from doctors, who saw plaintiff prior to 11/6/79, that the employee could not perform heavy labor, that his physical limitations "might improve," and that should try to return to work, "does not constitute evidence to support a finding of recovery of work capacity." Id. at 638-39. The employer conceded the record contained no evidence that plaintiff could return to anything other than light work.

To receive total incapacity benefits, an employee must demonstrate that she could perform only part-time work, regardless of its availability. Monaghan v. Jordan's Meats, 2007 ME 100, ¶ 12, 928 A.2d 786. Dr. Bridgman testified that she could potentially work up to eight hours per day. Given this opinion, plaintiff has not raised an issue of fact that the hearing officer would have found her to be totally incapacitated.

Finally, plaintiff argues that the hearing officer did find that plaintiff could only perform part-time work. (Add. S.M.F. ¶ 12.) This argument misconstrues the hearing officer's decision, in which he states plaintiff was "probably capable at this time of part-time, light-duty work . . . earning about $200/week in the local competitive labor market." (McCann Dep. Ex. 11, ¶ 13.) The hearing officer's decision was based on what plaintiff could earn in the local competitive labor market. He never reached the issue of whether plaintiff could perform any full-time work, regardless of its availability.

2

Because the court finds that it did not err in granting summary judgment on the issue of total incapacity benefits, the court does not readdress plaintiff's argument about Social Security benefits.

The entry is

Plaintiff's Motion to Alter or Amend Judgment is DENIED.

Date: May 23, 2014

Nancy Mills
Justice, Superior Court

3

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

DAVID M HIRSHON ESQ
HIRSHON LAW GROUP PC
208 FORE STREET
PORTLAND ME 04101

*Plaintiff's Attorney*

CLERK OF COURTS
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101

PHILIP P MANCINI ESQ
DRUMMOND & DRUMMOND
ONE MONUMENT WAY
PORTLAND ME 04101

*Defendant's Attorney*

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-12-161
*NM - CUM - 3/19/2014*

BONNIE ALLEN,

Plaintiff

v.

ALEXANDER F. MCCANN,

Defendant

ORDER ON MOTION FOR
SUMMARY JUDGMENT

This matter is before the court on defendant's motion for summary judgment on plaintiff's complaint alleging legal malpractice. For the following reasons, the motion is granted.

BACKGROUND

Plaintiff Bonnie Allen was a mill worker for the Mead Company (Mead).[1] (Supp. S.M.F. ¶¶ 1-2). On June 4, 2002, she injured her neck, back, arms, and shoulders while handling a high-pressure hose at work. (Supp. S.M.F. ¶ 2; Opp. S.M.F. ¶ 2.) Following the accident, plaintiff hired defendant Alexander McCann, Esq. in December 2002 to represent her in her workers' compensation claim. (Supp. S.M.F. ¶ 4.) Plaintiff continued to work full time at Mead under appropriate work restrictions. (Supp. S.M.F. ¶ 5.) Her condition worsened, however, and by August 2004 she had completely stopped working based on the advice of her doctors. (Supp. S.M.F. ¶¶ 6-7; Opp. S.M.F. ¶ 7.) Although Mead

---

[1] The Mead Company was previously known as MeadWestvaco Corporation. (Opp. S.M.F. ¶ 1.)

disputed whether she was totally incapacitated, it began paying plaintiff workers' compensation benefits on August 4, 2004. (Supp. S.M.F. ¶ 9.)

In December 2004, Mead offered plaintiff a different job. (Supp. S.M.F. ¶ 11.) Plaintiff's treating physician, David L. Phillips, II, reviewed the job description and determined that plaintiff could not perform the work. (Supp. S.M.F. ¶ 12.) Following Dr. Phillips' advice, plaintiff declined the job and remained out of work. (Supp. S.M.F. ¶ 14.)

In February 2005, plaintiff applied for Social Security Disability Insurance (SSDI). (Supp. S.M.F. ¶ 15; Opp. S.M.F. ¶ 15.) Plaintiff's application was initially denied, but she was ultimately successful in 2007. (Supp. S.M.F. ¶ 16; Opp. S.M.F. ¶ 16.) Plaintiff received $857.10 in monthly benefits. (Allen Aff. ¶ 16; Ex. D, 2.)

In March 2005, Dr. Peter A. Bridgman, performed an independent Section 312[2] medical evaluation on plaintiff, and in his opinion he stated, "the patient is capable of some limited work with her upper extremities." (Supp. S.M.F. ¶ 18; Add. S.M.F. ¶ 5.) Dr. Bridgman confirmed this opinion in a deposition on June 2, 2005, in which he stated that plaintiff could work with certain restrictions. (Add. S.M.F. ¶ 6.)

In April 2005, Mead offered plaintiff a different job. (Supp. S.M.F. ¶ 19.) Plaintiff reviewed the job with Dr. Phillips and declined the job based on his advice and a visit to the job site. (Supp. S.M.F. ¶ 20; Opp. S.M.F. ¶ 20.) In a letter dated July 6, 2005, Dr. Phillips offered his opinion that "Bonnie Allen is totally and permanently disabled and is unlikely to recover in the near future. There is

---

[2] 39-A M.R.S.A. § 312 provides for independent medical examinations in contested workers' compensation cases.

2

no medical treatment or surgery that would allow her to fully recover and return to gainful employment." (Supp. S.M.F. ¶ 21.)

On August 20, 2005, Mead suspended plaintiff's total incapacity workers' compensation benefits, claiming she voluntarily refused reasonable employment. (Supp. S.M.F. ¶ 23.) At defendant's request, plaintiff's benefits were provisionally reinstated at a partial incapacity level[3] on 9/27/05 pending an evidentiary hearing on 2/9/06. (Supp. S.M.F. ¶ 24.) On 2/1/06, Mead's labor market survey expert issued a report on the stability of the labor market. (Add. S.M.F. ¶ 9.) After the hearing, the transcript of Mead's labor market expert was admitted into evidence on 3/31/06. (Add. S.M.F. ¶ 11.)

On 5/18/06, the hearing officer issued a decision and found plaintiff was unable to perform the jobs that Mead had offered her, but concluded that plaintiff was "partially, as opposed to totally, incapacitated on account of her work injury since August 30, 2005 and continuing." (Supp. S.M.F. ¶¶ 29-30.) The hearing officer found that plaintiff "has been since August 2005 capable of earning about $200/week in the local competitive labor market." (Add. S.M.F. ¶ 13.) The decision provides: "Ms. Allen has not presented evidence of a work search and is therefore not eligible for 100% partial incapacity benefits." (Add. S.M.F. ¶ 14.) Accordingly, plaintiff was awarded partial incapacity benefits at a rate of $308.48 per week. (Add. S.M.F. ¶ 13.)

After reading the May 2006 decision, plaintiff asked defendant whether she should be looking for work. (Add. S.M.F. ¶ 23.) Defendant responded that

---

[3] Prior to the suspension, plaintiff received $456.24 per week in benefits for total incapacity. Her benefits were provisionally reinstated at $350.00 per week. (Add. S.M.F. ¶¶ 7-8.)

3

she was not required to look for work. (Add. S.M.F. ¶ 24.) At no time did defendant advise plaintiff to conduct a work search.[4] (Add. S.M.F. ¶ 15.)

In March 2009, plaintiff hired James MacAdam, Esq. to represent her in her workers' compensation claim. (Supp. S.M.F. ¶ 57.) At Attorney MacAdam's direction, plaintiff began a work search in April 2009 but never found employment. (Supp. S.M.F. ¶¶ 58-59.) Attorney MacAdam intended to use the failed work search to petition for an increase in her workers' compensation benefits. (Add. S.M.F. ¶ 37.) Mead raised a *res judicata* defense to any change in plaintiff's benefits. (Add. S.M.F. ¶ 37.) On December 7, 2010, Attorney MacAdam demanded a settlement of $350,000 from Mead. (Supp. S.M.F. ¶ 60.) Plaintiff ultimately settled her workers' compensation claim for $300,000. (Supp. S.M.F. ¶ 63.)

PROCEDURAL HISTORY

Plaintiff filed a single count complaint for professional malpractice on 3/29/12. Plaintiff alleges defendant was negligent in failing to advise her to perform a work search prior to her workers' compensation hearing, which caused her to receive partial, as opposed to total, incapacity benefits. Defendant moved for summary judgment on 2/21/13. On 6/12/13, defendant filed a suggestion of bankruptcy to stay the case. On 11/15/13, the court received notice that defendant's bankruptcy case had been dismissed.

DISCUSSION

1. Standard of Review

---

[4] Although defendant denies that he never advised plaintiff to do a work search, the record citation does not support defendant's contention that he advised plaintiff to look for work. (Opp. S.M.F. ¶ 15; Reply S.M.F. ¶ 15; Supp. S.M.F. ¶ 49.)

4

"Summary judgment is appropriate when there is no genuine issue of material fact that is in dispute and, at trial, the parties would be entitled to judgment as a matter of law." Fitzgerald v. Hutchins, 2009 ME 115, ¶ 9, 983 A.2d 382. "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter." Brown Dev. Corp. v. Hemond, 2008 ME 146, ¶ 10, 956 A.2d 104. To avoid a summary judgment, "[t]he plaintiff must establish a prima facie case for each element of his cause of action." Steeves v. Bernstein, Shur, Sawyer & Nelson, P.C., 1998 ME 210, ¶ 11, 718 A.2d 186 (quoting Barnes v. Zappia, 658 A.2d 1086, 1089 (Me. 1995)).

"In legal malpractice cases, plaintiff must show (1) a breach by the defendant attorney of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of the duty proximately caused an injury or loss to the plaintiff." Niehoff v. Shankman & Assocs. Legal Ctr., P.A., 2000 ME 214, ¶ 7, 763 A.2d 121. "Proximate cause exists in professional malpractice cases where 'evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence. The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment.'" Id. ¶ 8 (quoting Merriam v. Wanger, 2000 ME 159, ¶ 8, 757 A.2d 778).

2. Standard of Care and Breach

5

Plaintiff alleges defendant negligently failed to advise her to perform a work search, which would have resulted in her receipt of the full amount of workers' compensation benefits. The Workers' Compensation Act divides benefits into total incapacity and partial incapacity for work benefits. 39-A M.R.S.A. § 212-13 (2013). For medical issues, including an employee's ability to work, the Workers' Compensation Board shall adopt the findings of an independent medical examiner "unless there is clear and convincing evidence to the contrary in the record that does not support the medical findings." Id. § 312(7).

In Monaghan v. Jordan's Meats, the Law Court explained the three ways an employee can prove entitlement to full workers' compensation benefits:

> First, an employee who demonstrates a total physical incapacity, that is, the medically demonstrated lack of the physical ability to earn, can prove entitlement to 'total' incapacity benefits pursuant to section 212 without a showing of any work search or other evidence that work is unavailable.

> Second, in limited situations, an employee suffering only partial incapacity to earn may be entitled to 'total benefits' pursuant to section 212 if the employee can establish both (1) the unavailability of work within the employee's local community, and (2) the physical inability to perform full-time work in the statewide labor market, regardless of availability.

> Third, a partially incapacitated employee may be entitled to '100% partial' incapacity benefits pursuant to section 213 based on the combination of a partially incapacitating work injury and the loss of employment opportunities that are attributable to that injury. In order to obtain the 100% benefit, it must be established, pursuant to the 'work search rule' that work is unavailable within the employee's local community as a result of the work injury.

Monaghan v. Jordan's Meats, 2007 ME 100, ¶¶ 11-13, 928 A.2d 786 (internal citations and quotations omitted). The court clarified however, that the "work search rule" is a misnomer because "any competent and persuasive evidence to

6

show the unavailability of work in his or her local community is acceptable, including labor market surveys, or other credible evidence regarding availability of work for a particular employee in the local community." Id. ¶ 16. Nevertheless, in many cases "a work search is the most straightforward and persuasive method of demonstrating the availability of work, or lack thereof." Id.

Once Dr. Bridgman, the independent medical examiner in plaintiff's case, issued his finding that plaintiff was not totally incapacitated from work, plaintiff alleges that defendant had a duty to advise plaintiff to conduct a work search. Defendant argues there was no breach in this case for three reasons: (1) plaintiff could not have performed a "good faith" work search, (2) because plaintiff had no work restrictions she could not have performed a work search, and (3) a work search would have jeopardized her SSDI application, her disability pension, and her life insurance proceeds.

a. Good Faith Requirement

Defendant argues that because plaintiff believed she was unable to perform any type of work, she could not have looked for a job in good faith. One of the factors for determining the adequacy of an employee's work search is "[w]hether the search was undertaken in good faith." Id. ¶ 21 (citing McIntyre v. Great N. Paper, Inc., 2000 ME 6, ¶ 7, 743 A.2d 744). Good faith is just one of many non-exclusive factors that hearing officers look to in evaluating the adequacy of a work search. Id. Moreover "[t]he mere fact that an employee has engaged in a search for work does not constitute competent evidence that he has recovered some earning capacity." Cote v. Osteopathic Hosp. of Me., Inc., 432 A.2d 1301, 1305 (Me. 1981). In Crocker v. Eastland Woolen Mill, Inc., the Law

7

Court explained the rationale for applying the work search rule to plaintiff's situation:

> The prime advantage of allowing the commissioner to infer total disability without a showing by the employee of attempts to find suitable employment is that it excuses the partially disabled employee from performing a possibly useless act in cases where the combination of the employee's physical limitations and the conditions of the local job market render the employee's skills clearly unmarketable. But it is the very difficulty of determining when an employee's skills are "clearly unmarketable" that reveals the wisdom of the traditional formulation.
>
> . . .
>
> Actual rejection by the market is the best test of unmarketability.

Crocker v. Eastland Woolen Mill, Inc., 392 A.2d 32, 36 (Me. 1978). Contrary to defendant's claim, plaintiff could have engaged in a work search without conceding that she had the capacity to perform some work. Alternatively, defendant could have submitted other evidence to prove the unavailability of jobs in plaintiff's community. See Lamphier v. Bath Iron Works Corp., 2000 ME 121, ¶ 3, 755 A.2d 489 ("Although Lamphier had not conducted a work-search, he submitted a labor market survey that the Board concluded satisfied his burden of production to show the unavailability of work within his restrictions."); (Add. S.M.F. ¶ 21.)[5]

b. No Work Restrictions

Defendant next argues that it would have been impossible for plaintiff to perform a work search because she had no defined work restrictions. The independent medical examiner, Dr. Bridgman, stated plaintiff "should probably have a functional capacity evaluation which would allow us to decide in a more objective fashion what her work capacities are." (Supp. S.M.F. ¶ 18.) He stated

---

[5] Although defendant denies that he failed to offer other evidence he does not provide a record citation to support his denial and his objection that the fact is a legal conclusion is unfounded. (Reply S.M.F. ¶ 21.)

8

plaintiff was "capable of some limited work with her upper extremities." (Add. S.M.F. ¶ 5.) In his June 2, 2005 deposition, "Dr. Bridgman reiterated his opinion that plaintiff would be able to work with certain restrictions, initially for four hours per day." (Add. S.M.F. ¶ 6.) Defendant could have advised plaintiff to look for work with these restrictions.

c. Other Benefits

Defendant next argues that a work search could have jeopardized plaintiff's SSDI benefits and her disability pension and disability insurance from Mead. Thus, defendant argues he did not breach his duty because he maximized plaintiff's financial position under Maine's workers' compensation law and the Social Security Act.

A work search alone would not have disqualified plaintiff from receiving SSDI benefits. Plaintiff would have been eligible for SSDI provided she did not engage in "substantial gainful activity"; in 2005, the amount was $830 per month. 20 C.F.R. § 404.1574(b) (2013); Social Security Administration, *Substantial Gainful Activity*, http://www.ssa.gov/oact/cola/sga.html (last visited Feb. 13, 2014). Nothing in the regulations would penalize plaintiff for performing a work search. Further, as discussed previously, defendant could have submitted other evidence to prove no jobs were available to plaintiff in the local community.

Defendant also argues that if plaintiff had gone to work for another company without prior approval from Mead, she would have "lost her job and the benefits that flowed from it." (Supp. S.M.F. ¶¶ 52-53.) Again, however, defendant does not claim that simply performing a work search would have violated the terms of her collective bargaining agreement with Mead.

9

### 3. Proximate Cause and Damages

Defendant argues that even if his representation of plaintiff fell below the standard of care, his actions did not proximately cause plaintiff any harm. To prove causation in a legal malpractice claim, "a plaintiff must demonstrate that he or she would have achieved a more favorable result but for the defendant's alleged malpractice." Niehoff, 2000 ME 214, ¶ 9, 763 A.2d 121. Defendant argues that plaintiff cannot meet this standard because: (1) plaintiff could have conducted a work search and sought to amend her benefits by showing "changed circumstances" warranted an increase in her benefits, (2) plaintiff received other benefits that offset the reduction in her workers' compensation benefits, and (3) plaintiff's workers' compensation settlement fully compensated her for her original claim.

### a. Changed Circumstances

Defendant argues that plaintiff could have performed a work search and filed a petition for review of incapacity with the Workers' Compensation Board to increase her benefits based on changed circumstances. The Law Court has explained, "[t]he 'changed circumstances' rule is related to the doctrine of res judicata." McIntyre v. Great N. Paper, Inc., 2000 ME 5, ¶ 5, 743 A.2d 744. Thus, "in order to prevail on a subsequent petition for review, the party petitioning must show a change of circumstances from the previous decree sufficient to justify a different result." Id.

In McIntyre, the Law Court found that the employee showed a change in circumstances, but noted that it "was not a case where the employee merely undertook the necessary work search, or endeavored to gather information about the availability of employment, after a negative finding." Id. ¶ 7. Relying on this

10

language in McIntyre, the Workers' Compensation Board has found that a new work search alone is insufficient to demonstrate a change in circumstances. Copp v. Anthem BC/BS, W.C.B. 03-01-84-71, *2 (Me. 2007) ("I conclude that the performance of a new work search, even a work search capable of carrying the employee's burden of proof on the issue of unavailability of work, is insufficient on its own, to demonstrate a change in circumstances where the Board has recently decided the issue against the Employee.").

Defendant relies on several cases in which the Board increased partial incapacity benefits after an employee performed a work search. In Bergeron v. Keith Pelletier Logging, the Board originally found that the employee had a 50% partial incapacity. Bergeron v. Keith Pelletier Logging, W.C.B. 98-00-63-06, *2 (Me. 2010). The employee filed a petition for review and the Board found that he demonstrated a change in economic circumstances based on a work search. Id. at *3-5. The Board's decision, however, also noted that the employee's injury had worsened and that he no longer had a valid work visa to look for employment in Maine. Id. *2-3. Thus, unlike in Copp, the Board's decision was not premised solely on a new work search.

Similarly, in Dallaire v. Intelligent Control, Inc. and Hilligoss v. Sisters of Charity, the employee showed a change in circumstances beyond performing a work search. In Dallaire, the employee entered into a consent decree with the employer that required the employer to pay 25% partial incapacity benefits. Dallaire v. Intelligent Control, Inc., W.C.B. 04-030795, *1 (Me. 2010). Following the consent decree, the employee lost his job, was laid off from two other jobs, and remained unemployed for an extended period. Id. at *3. Because of these new circumstances, the Board entertained the employee's request for 100%

11

partial incapacity benefits and found the failed work search sufficient to award full benefits. Id. *4-6. Hilligoss also involved a consent decree, after which the employee's doctors instructed her to stop working. Hilligoss v. Sisters of Charity, W.C.B. 03-011415, *1 (Me. 2011). Both of these cases involved changed circumstances that went beyond the employee's decision to do a work search.

The other cases defendant relies on involved a change in medical circumstances. See Grant v. Schwan's Home Serv., Inc. W.C.B. 03-01-74-43, *2-3 (Me. 2012) (involving an employee whose work-related depression had worsened); Shavirov v. Applicator's Sales & Serv., Inc., W.C.B. 05-031607, *4 (Me. 2010) (involving an employee who was diagnosed with depression and anxiety since the initial award of benefits). Despite defendant's claims, a work search alone does not constitute changed circumstances.

### b. 100% Partial Incapacity vs. Total Incapacity

Plaintiff's expert states if plaintiff had performed a work search, "the Worker's Compensation Board probably would have concluded that her work search was adequate under the Act, entitling her to full benefits." (Add. S.M.F. ¶¶ 19-20.) The crucial distinction between receiving total incapacity benefits and 100% partial incapacity benefits is the length of time the benefits can last. Total incapacity benefits last as long as the disability lasts or, in the case of a permanent disability, the employee's lifetime. 39-A M.R.S.A. § 212(1). Partial benefits, on the other hand, are limited to a maximum of ten years.[6] See 39-A M.R.S.A. § 213(1)(A) & (4) ("The 260-week limitation contained in subsection 1 may not be extended under this subsection to more than 520 weeks."). A critical

---

[6] There is an exception to the 10-year rule if the employee's partial injury "is in excess of 15% of the body." 39-A M.R.S.A. § 213(1)(A). Plaintiff's injury does not fall under this exception. (Add. S.M.F. ¶ 31.)

12

issue in this case regarding damages is whether a work search likely would have resulted in a finding of total incapacity or 100% partial incapacity.

As discussed above, there are two ways to receive total incapacity benefits. The first method is by medically demonstrating "a lack of the physical ability to earn." Monaghan, 2007 ME 100, ¶ 11, 928 A.2d 786. The independent medical examiner, Dr. Bridgman, testified that plaintiff did not have a total incapacity to earn. (Supp. S.M.F. ¶ 18.) Plaintiff would not have been able to demonstrate a total incapacity under this method because the hearing officer must credit the independent medical examiner's opinion absent clear and convincing evidence to the contrary in the record. 39-A M.R.S.A. § 312(7).

The second method for demonstrating a total incapacity applies only in "limited situations." Monaghan, 2007 ME 100, ¶ 12, 928 A.2d 786. The employee with partial incapacity to earn may qualify for total incapacity benefits by showing both (1) the unavailability of work in the local community and (2) "the physical inability to perform full-time work in the statewide labor market, regardless of availability." Id. ¶ 12. Although a work search is a necessary element of proving total incapacity benefits under this method, plaintiff would also have had to show that she was incapable of performing any full-time work in the state at the time of the hearing. See Pratt v. Fraser Paper, Ltd., 2001 ME 102, ¶ 15, 774 A.2d 351.

Plaintiff has not raised a genuine issue of material fact regarding whether she would have received total incapacity benefits under the second method if she had performed a work search prior to the May 2006 hearing. Although plaintiff's experts state that plaintiff likely would have received total incapacity benefits if she had performed a work search, they do not explain how the hearing officer

13

would have found that she was not capable of performing any full-time work. (Cohen Aff. ¶ 10; MacAdam Aff. ¶ 3.) Plaintiff argues that the hearing officer did find that she was only capable of part-time, light-duty work. (Add. S.M.F. ¶ 12.) In the decision, the hearing officer states:

> 12. I find and conclude that the employee has been partially, as opposed to totally, incapacitated on account of her work injury since August 30, 2005, and continuing. Ms. Allen has not presented evidence of a work search and is therefore not eligible for 100% partial incapacity benefits.
>
> 13. The employee is probably capable at this time of part-time, light-duty work. Based upon an analysis of such factors as the employee's age, education, vocational history, presentation/demeanor at hearing, pre-injury AWW and physical restrictions related to the injury, I find and conclude that Ms. Allen has been since August 2005 capable of earning about $200.00/week in the local competitive labor market.

(Add. S.M.F. ¶¶ 12, 14; Pl.'s Ex. N.) The hearing officer states only that plaintiff was not eligible for 100% partial incapacity benefits and explicitly finds that she was not totally incapacitated.

Plaintiff cites nineteen cases in which plaintiff alleges the same hearing officer awarded "full benefits." (Plaintiff's Opp. Mem., 9 n.1.) The hearing officer awarded total incapacity benefits, as opposed to 100% partial incapacity benefits, based on a failed work search in only four of these cases. In the cases in which total incapacity benefits were awarded, the hearing officer received undisputed medical opinions that the employee should be restricted to part-time work. See Hilligoss, W.C.B. 03-011415, *2 (Me. 2011) (relying on a section 207 doctor's opinion that the employee should be restricted to 10-20 hours per week of work); Melanson v. Bath Iron Works Corp., W.C.B. 83-015213, *2 (Me. 2009) (relying on the opinions of two doctors and the consistent report of the independent medical examiner); Slocomb v. Me. Grown Poultry, Inc., W.C.B. 98-

14

011596, *3 (Me. 2008) (relying on a section 207[7] doctor's opinion that the employee "would be able to tolerate just 4 hours per day upon entering the workforce"); Duteau v. Lepage Bakeries, Inc., W.C.B. 00-003206, *2 (Me. 2006) (relying on the independent medical examiner's opinion "that the employee has only a part-time work capacity").

These cases make clear that plaintiff would have to show the independent medical examiner, Dr. Bridgman, limited her to part-time work. Plaintiffs have not identified any portions of Dr. Bridgman's opinion that would support her claim for total incapacity benefits. Dr. Bridgman merely opined that plaintiff "is capable of some limited work with her upper extremities." (Supp. S.M.F. ¶ 18.) Thus, plaintiff's expert's opinion that the hearing officer would have awarded total incapacity benefits is speculation. As discussed above, "when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment." Niehoff, 2000 ME 214, ¶ 8, 763 A.2d 121. It is probable the hearing officer would not have awarded total incapacity benefits to plaintiff in 2006. Accordingly, summary judgment on the issue of total incapacity benefits is appropriate.

Plaintiff has raised a genuine issue of material fact regarding whether she would have received 100% partial incapacity benefits if she had been advised to conduct a work search. To receive 100% partial incapacity benefits, a plaintiff must present evidence only of a failed work search or other comparable evidence. From April 2009 to December 2010, plaintiff performed a thorough but unsuccessful work search. (Add. S.M.F. ¶¶ 34-36.) Thus, plaintiff can argue that

---

[7] 39-A M.R.S.A. § 207 requires an employee to submit to a medical examination by a doctor of the employer's choosing.

15

if she had performed the same search before the 2006 hearing, she would have been awarded 100% partial incapacity benefits.

### c. SSDI Offset

Defendant argues even if plaintiff performed a work search and was awarded 100% partial incapacity benefits, the additional benefits would have been offset by a reduction in her SSDI benefits.[8] (Supp. S.M.F. ¶ 43; Opp. S.M.F. ¶ 43[9].) Under federal law, an SSDI beneficiary who also receives workers' compensation benefits under state law cannot receive more than 80% of her "average current earnings."[10] 42 U.S.C. § 424a(a)(5) (2013); see also Davidson v. Sullivan, 942 F.2d 90, 92 (1st Cir. 1991) ("Where an individual receives both worker's compensation benefits and social security benefits, the total benefits received may not exceed eighty percent of his predisability income.")

---

[8] Plaintiff argues the collateral source rule prevents the court from considering the SSDI payments. Under the collateral source rule, "if a plaintiff is compensated in whole or in part for his damages by some source independent of the tortfeasor, he is still permitted to have full recovery against him." Werner v. Lane, 393 A.2d 1329, 1335 (Me. 1978). Plaintiff relies on St. Francis de Sales Federal Credit Union v. Sun Insurance Co. of New York,[8] in which the Law Court ruled "that evidence of other insurance covering the same losses was not admissible on issues of causation and punitive damages." St. Francis de Sales Fed. Credit Union v. Sun Ins. Co. of New York, 2002 ME 127, ¶ 21, 818 A.2d 995.

In this case, however, defendant also represented plaintiff in obtaining SSDI benefits. Defendant made a strategic decision to pursue a variety of benefits for plaintiff and those benefits were not collateral. The proper damages in the case should be the difference between the amount of benefits defendant obtained for plaintiff and the amount plaintiff alleges he should have obtained for her. See Hoitt v. Hall, 661 A.2d 669, 673 (Me. 1995) ("The measure of damages is the amount the client would have recovered but for the attorney's negligence."); see also 3 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 21.20 (2014 ed.) ("In a legal malpractice action, the objective is to determine what sum the client should have recovered had the lawyer not erred.")

[9] Plaintiff relies on the deposition of Jeffrey Cohen, which has not been provided to the court. Paragraph 17 of the Allen affidavit appears to conflict with Exhibit D attached to the affidavit. In any event, paragraph 17 is not referred to in the plaintiff's statement of material facts and is not considered.

[10] "Average current earnings" is defined in 42 U.S.C. § 424a(a) as: "the largest of (A) the average monthly wage (determined under section 415(b) of this title as in effect prior to January 1979) used for purposes of computing his benefits under section 423 of this title, (B) one-sixtieth of the total of his wages and self-employment income (computed without regard to the limitations specified in sections 409(a)(1) and 411(b)(1) of this title) for the five consecutive calendar years after 1950 for which such wages and self-employment income were highest, or (C) one-twelfth of the total of his wages and self-employment income (computed without regard to the limitations specified in sections 409(a)(1) and 411(b)(1) of this title) for the calendar year in which he had the highest such wages and income during the period consisting of the calendar year in which he became disabled (as defined in section 423(d) of this title) and the five years preceding that year."

16

Plaintiff was awarded weekly workers' compensation benefits for partial incapacity at the rate of $308.48 beginning in May 2006. (Add. S.M.F. ¶ 13.) If plaintiff had been awarded 100% partial incapacity benefits, she alleges she would have received an additional $147.76 per week. (Add. S.M.F. ¶ 45.) Defendant argues this additional $147.76 per week would have been subtracted from plaintiff's SSDI benefits. Thus, defendant argues plaintiff sustained no damages over the ten-year period that the partial incapacity benefits would have lasted. (Supp. S.M.F. ¶¶ 43-45[11].)

It appears plaintiff's monthly SSDI reduced benefits of $857.10 were based on plaintiff's worker's compensation benefits of $456.24 per week or $1,977.00 per month and based on her allowed maximum amount of workers' compensation and SSDI benefits of $2,822.40. (Opp. S.M.F. ¶ 43; Allen Aff. ¶ 16; Ex. D, 1-2.) ("We have to take into account your workers' compensation payment of $1,977.00 when we figure your Social Security benefits. Because you receive this payment, we are reducing the benefits you are due.") The Notice of Award from the Social Security Administration, referred to by plaintiff as an explanation of her benefits, shows the SSDI benefits would not have been reduced from the initial total SSDI benefit amount if the plaintiff's workers' compensation benefits were based on $1336.70 per month or $308.48 per week. (Opp. S.M.F. ¶ 43 ("Your present workers' compensation payments of $1,336.70 do not affect your Social Security benefits.")) Accordingly, if the defendant had succeeded in obtaining the weekly amount of workers' compensation benefits plaintiff alleges

---

[11] Plaintiff responds to the testimony of the defendant on this issue by referring to the Notice of Award from the Social Security Administration and by objecting to the testimony as a legal conclusion and as precluded by the collateral source rule. (Opp. S.M.F. ¶¶ 43-45.)

17

he should have obtained, her SSDI benefits would have been reduced as they were in the Notice of Award. Plaintiff has not raised a genuine issue of material fact regarding whether increased social security benefits would have offset her reduced workers' compensation benefits.

### d. Workers' Compensation Settlement

Plaintiff settled her workers' compensation case in 2010 for $300,000.[12] (Supp. S.M.F. ¶ 63.) Plaintiff alleges she lost $147.76 per week as the difference between the benefits she received and 100% partial incapacity benefits. (Add. S.M.F. ¶ 45.) During ten years, or 520 weeks, the maximum defendant's negligence could have harmed plaintiff was $76,835.20.[13] The settlement more than fully compensated her for not receiving 100% partial incapacity benefits. Because plaintiff cannot prove that she would have received total incapacity benefits, which continue beyond the ten-year limit, the settlement compensated plaintiff for any financial harm defendant may have caused her.

### 4. Emotional Distress

In her complaint, plaintiff also alleged that she suffered emotional distress damages as a result of defendant's negligence. (Compl. ¶ 12.) When an attorney's conduct is not egregious and the only alleged injury is economic, damages for emotional distress are not recoverable. Garland v. Roy, 2009 ME 86, ¶ 26, 976 A.2d 940. Defendant's alleged negligence, essentially a tactical error, cannot be described as egregious. Plaintiff is not entitled to damages for emotional distress.

The entry is

> Defendant's Motion for Summary Judgment is
> GRANTED. Judgment is granted in favor of the

---

[12] $40,000 of this settlement went to plaintiff's attorney for costs and fees. (Supp. S.M.F. 64.)
[13] 520 weeks x $147.76 = $76,835.20.

18

Defendant and against the Plaintiff on the Plaintiff's Complaint. Defendant's Third-Party Complaint for Contribution and/or Indemnification is Moot.

Date: March 18, 2014

Nancy Mills
Justice, Superior Court

CUMB CV-12-161

19

PHILIP MANCINI ESQ
DRUMMOND & DRUMMOND
ONE MONUMENT WAY
PORTLAND ME 04101




MARSHALL TINKLE ESQ
DAVID HIRSHON ESQ
208 FORE ST
PORTLAND ME 04101