ENTERED JUL 2 8 201

STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
Cumberland, ss, Clerk's Office

JUN 13 2014

RECEIVED

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-006
TDW-CUM-06-13-14

VAUGHN SLEEPER, et al,

Plaintiffs

v.                                                                    ORDER

DANIEL G. LILLEY, et al,

Defendants

Before the court are two post-trial motions by defendants Daniel G. Lilley and Daniel G. Lilley Law Offices P.A. (collectively, "the Lilley defendants"): (1) a renewed motion for judgment as a matter of law pursuant to M.R.Civ.P. 50(b) and (2) a motion for a new trial and remittitur pursuant to M.R.Civ.P. 59(a).

Judgment was entered on January 6, 2014. The Lilley defendants' motions were timely filed on January 16. The first round of briefing was completed a month later, but resolution of the motions was thereafter delayed while portions of the transcript were ordered. A hearing on the motion was held on May 8, supplemental briefs were filed by May 16, and the parties have since filed further submissions based on review of the transcript excerpts that had been obtained.

Legal Principles Applicable to Defendants' Motions

On the Lilley defendants' renewed motion for judgment as a matter of law under Rule 50(b), the court must determine "if any reasonable view of the evidence and those inferences that are justifiably drawn from the evidence supports the jury verdict." *Russell v. Expressjet Inc.*, 2011 ME 123 ¶ 10, 32 A.3d 1030, *quoting Madore v. Kennebec*

*Heights Country Club*, 2007 ME 92 ¶ 5, 926 A.2d 1180. The court cannot substitute its judgment for that of the jury. The weighing of evidence, including the credibility of witnesses, is reserved to the jury. *Wood v. Bell*, 2006 ME 98 ¶12, 902 A.2d 843.

On the motion for a new trial, the Lilley defendants must establish that it is reasonably clear that prejudicial error has been committed or that substantial justice has not been done. *Davis v. Currier*, 1997 ME 199 ¶ 7, 704 A.2d 1207. This standard is not intended to allow a trial judge to substitute his or her view of the evidence for the decision of the jury. *Chenell v. Westbrook College*, 324 A.2d 735, 737 (Me. 1974). The Lilley defendants' new trial motion relies primarily on alleged errors in the admission of evidence and in the conduct of the trial that allegedly prejudiced the jury.

Arguments Raised

At the outset the court notes that lengthy portions of the legal memoranda submitted by the Lilley defendants on their post-trial motions consist of attempts to reargue the evidence. Whatever the merits of those arguments, they either were or should have been presented to the jury. Neither Rule 50(b) nor Rule 59(a) offers any relief to the extent that the jury found against the Lilley defendants on the evidence.

Moving beyond the Lilley defendants' effort to reargue the evidence, the court finds that a number of their arguments are without merit.[1] Nevertheless, the court

---

[1] Specifically, the record does not support the Lilley defendants' contention that the Sleepers' expert did not offer an adequate opinion that the Lilley defendants were negligent in handling the IIED claim and does not support the Lilley defendants' contention that they were not informed that the court's instruction that the jury could not consider the Sleepers' estimate of the fair market value of their farm or the McCausland damage figure would be given orally rather than as part of the written instructions. In addition, the court sees no basis on which to order remittitur on the Lilley defendants' claim that the damages awarded were excessive. Under the court's instructions, all but $30,000 of the jury award constituted an award for emotional distress, and the court has no principled basis to reduce the jury's evaluation of emotional distress. Finally, the court does not find any adequate basis to disturb the jury's finding that the Lilley defendants were professionally negligent.

2

concludes that the following issues raised by the Lilley defendants require further discussion:

(1) whether there was sufficient evidence to allow the jury to decide the claim that, absent malpractice by the Lilley defendants, the Sleepers would likely have prevailed on their tortious interference claim before the arbitrator;

(2) whether there was adequate evidence to support the damages claimed on the tortious interference claim;

(3) whether, given the court's summary judgment ruling, the Sleepers should have been allowed to proceed at trial on the claim that, absent malpractice by the Lilley defendants, the Sleepers would likely have prevailed on their IIED claim before the arbitrator;

(4) whether there was sufficient evidence to allow the jury to decide the claim that, absent malpractice by the Lilley defendants, the Sleepers would likely have prevailed on their IIED claim before the arbitrator;

(5) whether the court erroneously excluded certain evidence that the Lilley defendants wished to offer on the IIED issue and that might have been considered by the jury on both IIED and on the tortious interference issue;

(6) whether the Sleepers' estimate of the fair market value of their farm and the McCausland damage calculation worked up for purposes of the arbitration improperly influenced the jury notwithstanding the court's instruction that the jury could not consider those figures as evidence of damage;

(7) whether the court's instruction as to the weight to be given to expert testimony was erroneous;

(8) whether under *Steeves v. Bernstein, Shur, Sawyer & Nelson*, 1998 ME 210 ¶¶ 17-18, 718 A.2d 186, plaintiffs should not have been entitled to a jury on the question of whether the Sleepers would have prevailed before the arbitrator and the amount of any damage award.

By way of background in considering the above subjects, it should be noted that the trial was significantly affected by scheduling issues. Counsel for both parties originally estimated that, with the jury already picked, the case could be tried to a verdict in four or five days. The case was therefore scheduled to begin on December 16. In retrospect this was an ill-advised decision given the nature and complexity of the

3

case. As issues arose and the case bogged down, it became clear that the trial was going to run over into the Christmas week, and the parties and the court began rushing to try to get the case to the jury before the Christmas holiday.

At a certain cost, that objective was achieved.[2] However, the rush to finish the case prevented the court and the parties from taking the time that should have been allowed to consider certain issues and make an adequate record. The looming Christmas holiday contributed to some of the problematic rulings and the resulting prejudice outlined below.

## Tortious Interference Claim

The Sleepers' tortious interference claim depended on Ronald Barnes's testimony that he attended a meeting between Agway and the pool growers at which Agway "recommended" that the pool growers not purchase potatoes from Sleeper Farms. Barnes testified that the "general consensus" he took away from the meeting was that if he purchased seed from the Sleepers, "it would have consequences for marketing my crop the following year." He could not say what Agway had said that left him with that impression.

Barnes's testimony left open whether Agway engaged in some intimidation or merely made a recommendation which resulted in a fear of future consequences that was self-induced on Barnes's part. However, the court concludes that Barnes's testimony and the other evidence offered at trial, taken as a whole, could constitute circumstantial evidence of intimidation. The Lilley defendants are not entitled to judgment as a matter of law on this issue.

---

[2] Closing arguments and the jury charge were given on Monday December 23. However, the jury was not able to reach a verdict that day, and the jurors were not able to deliberate on Christmas Eve or on the day after Christmas because of travel and holiday plans. The verdict was ultimately returned on December 27, after a three day hiatus.

4

This does not, however, resolve the issue of whether a new trial should be granted on issues related to malpractice with respect to the tortious interference claim. As discussed below, there was certain evidence relevant to the issue of tortious interference that the court incorrectly declined to allow the Lilley defendants to introduce. See below at pp. 8-9 & n.4.

There is also a question whether there was adequate evidence that the $30,000 loss (which Vaughn Sleeper testified was caused by Agway's tortious interference) subsequently resulted in the loss of his farm – which was the basis for the Sleepers' claim of emotional distress. Although the entire farm was not sold off until approximately eight or nine years after Agway's tortious interference, Vaughn Sleeper testified that the process of liquidation began in 2001. However, there was little or no evidence as to why the $30,000 loss resulted in a need to begin liquidating the farm property, and there was evidence to the contrary – that the Sleepers could have obtained additional credit but Vaughn Sleeper decided he did not want to continue farming. There was also evidence that Agway went into bankruptcy a year after its interference with the Sleepers' sales to the pool growers and was therefore no longer in any position to interfere with the Sleepers' business.

The court does not conclude that no reasonable view of the evidence could support the Sleepers' claim that malpractice on the part of the defendants caused the loss of their farm. However, where there is a significant question as to the sufficiency of the Sleepers' evidence on that issue – given the size of the damage award in this case – the court has to look closely at the Lilley defendants' other claims of prejudicial error.

In this connection, the Lilley defendants contend that the court committed error in allowing the Sleepers' expert witness, Jerrol Crouter, to express certain damage opinions. They specifically object to Crouter's testimony that the Sleepers lost their

business and their farm as a result of the Lilley defendants' malpractice. The court agrees that, phrased in that manner, Crouter's testimony went beyond what should have been permissible and that there is at least a question whether the limiting instruction which the court gave with respect to Crouter's testimony was adequate to address that issue.[3] This would not justify a new trial but adds to the court's concerns given the instances of prejudicial error discussed below.

### IIED Claim

This claim had a mysterious progression to trial. Prior to trial the Lilley defendants moved for summary judgment as to all of the claims which the Sleepers alleged that the Lilley defendants had negligently pursued at arbitration. In response to that motion, the Sleepers argued that there were disputed issues of fact as to the Lilley defendants' failure to pursue four specific claims: (1) antitrust; (2) unfair competition; (3) tortious interference with an advantageous economic relationship; and (3) defamation. See Plaintiff's Memorandum in Opposition to Summary Judgment dated April 12, 2013 at 3. In opposing summary judgment, the Sleepers did not contend that there were disputed facts for trial with respect to the Lilley defendants' handling of the Sleepers' IIED claim.

The court, focusing only on the claims raised by the Sleepers in opposition to summary judgment, ruled that the case could go forward on the antitrust and tortious interference claims and granted summary judgment on the unfair competition and defamation claims. While the court could have granted summary judgment on all of the

---

[3] However, assuming that his opinions had been adequately disclosed in his designation or at his deposition, Crouter could have testified that the Lilley firm was negligent in not making the argument that the Sleepers had lost their farm as a result of Agway's tortious interference.

6

claims on which the Sleepers had not presented any opposition, it instead worded its entry on the docket as a denial of summary judgment except as to those claims identified in the order on which summary judgment has been granted.

However, the court understood that the only remaining claims for trial were based on alleged malpractice with respect to the antitrust and tortious interference claims. At the subsequent hearing on various motions in limine, issues arose as to the circumstances under which damages for emotional distress could have been obtained in the arbitration proceeding. At that time, the court stated that it thought that any claim of malpractice arising out of the IIED claim was no longer in the case. As far as the court can recall, counsel for the Sleepers did not argue to the contrary.

It is also the court's recollection that counsel for the Sleepers did not make any mention of the IIED claim in his opening statement at trial.[4] A review of the transcript indicates that counsel for the Sleepers first suggested that testimony would be offered with respect to the IIED claim after the second day of trial testimony. At that time the court responded it would have to look at the summary judgment ruling.

As far as the court can tell, most of the remaining discussion of this issue occurred off the record. It appears that the court reviewed the docket entry on the summary judgment motion and allowed the Sleepers to proceed because the docket entry did not foreclose a claim of negligence in the handling of the IIED claim. At that time, however, the court overlooked the fact that the Sleepers had not opposed summary judgment with respect to the IIED claim. The court also did not recall that at the in limine hearing it had conveyed its belief to counsel that the IIED claim was out of the case, and it did not recall that the Sleepers had not objected at that point.

---

[4] At the court's request, the court reporter conducted a search in plaintiffs' opening for any mention of "intentional infliction of emotional distress" and found none.

It is not clear that the Lilley defendants immediately placed on the record an objection that, in light of the history recounted above, the Sleepers should not be entitled to pursue a malpractice theory based on alleged mishandling of the Sleepers' IIED claim. However, the court recalls that counsel for the Lilley defendants raised this objection off the record when the issue first arose and raised it subsequently on the record after the Sleepers rested.

The court now agrees that, at a minimum, there was a considerable element of unfair surprise in the way that events unfolded on this issue. This contributes to the court's view that the motion for a new trial should be granted.

There is an additional reason supporting a new trial on the IIED claim. Counsel for the Lilley defendants sought to introduce a portion of the transcript of a taped telephone conversation to rebut Mary Sleeper's testimony that Agway had threatened to put the Sleepers out of business if Vaughn Sleeper was unwilling to file a false insurance claim. This was the centerpiece of the Sleepers' argument that Agway had engaged in conduct so extreme and outrageous as to exceed all possible bounds of decency and that must be regarded as atrocious and utterly intolerable. It is likely this testimony was also considered by the jury on the claim relating to tortious interference.[5]

A review of the transcript demonstrates that when counsel for the Lilley defendants rested, he did so subject to offering some additional exhibits.[6] A subsequent colloquy outside of the jury's presence demonstrates that the court had specifically

---

[5] If Agway had threatened the Sleepers in that manner, it would support a finding that Agway's "recommendation" to the pool growers was intended to be intimidating.

[6] At the time there was a question as to whether certain exhibits had been formally admitted and, as part of the effort to hurry the case along and get to the jury before Christmas, the court had allowed the parties to supplement the record with certain identified exhibits after they had formally rested before the jury.

agreed to allow the transcript of the telephone call to be admitted subject to a determination of which portions had to be included under the rule of completeness.[7] The transcript – which was a record of the actual conversation that Mrs. Sleeper testified included the threat to put the Sleepers out of business if they did not file a false insurance claim – was probative evidence as to what had actually occurred and a portion of that transcript can be read to strongly support the Lilley defendants' argument that the Agway representative did not make such a threat.

Ultimately, however, faced with the urgency of trying to conclude the trial before the Christmas holiday, the court declined to allow admission of the transcript because the parties could not agree as to the portions admissible under the rule of completeness. This was error. When the parties could not agree, given that the court had previously agreed to allow the Lilley defendants to offer portions of the transcript, the court should have itself reviewed the transcript and ruled on what portions were required for completeness – rather than excluding the transcript altogether. The court finds that the Lilley defendants were prejudiced by this ruling and that the prejudice was potentially significant.

The Lilley defendants also argue that they are entitled to judgment as a matter of law with respect to malpractice as it related to the IIED claim because there was no adequate evidence that the Sleepers suffered emotional distress that no reasonable person could have been expected to endure. On this issue the court discerns some tension between the Law Court's 2010 decision in *Lyman v. Huber*, 2010 ME 139 ¶¶ 21-24, 10 A.3d 707, and its decision this year in *Bratton v. McDonough*, 2014 ME 64 ¶¶ 23-24.

---

[7] See excerpt of December 20, 2013 transcript ordered for new trial motion at 8 (relating to the resting of defendants' case subject to the offering of exhibits). The parties had agreed that the transcript of the telephone call was authentic and that no testimony was necessary to provide foundation but were in disagreement as to what portions should be admitted.

9

A final ruling on this issue may depend on whether there is a sufficient connection between the allegedly outrageous conduct by Agway and the loss of the Sleeper farm — an issue that can be considered on retrial once the status of whether the IIED claim is in or out of this case is resolved.

## Whether Error with respect to Alternate Theory Affects Verdict

The Sleepers presented two theories to the jury. The first was that the Lilley defendants were negligent as to the handling of the Sleepers' tortious interference claim. The second was that the Lilley defendants were negligent as to the handling of the Sleepers' IIED claim. The Sleepers now argue that even if there was an infirmity with respect to either the evidence or the court's rulings on one of those two theories, the verdict can nevertheless be sustained if the jury could have found for the Sleepers on the other theory.

The first answer to this argument is that some of the problems necessitating a new trial relate to both of the Sleepers' theories. See, e.g., discussion above at pp. 8-9 & & n.4 and discussion below at pp. 11-14.

Secondly, the court disagrees that, in a case where the verdict form did not differentiate as to whether the Sleepers had prevailed on malpractice with respect to tortious interference or malpractice with respect to IIED, the verdict must be sustained so long as one of the two theories can be upheld. Although the Sleepers have cited contrary authority,[8] the Law Court's most recent decision on this issue ruled that where the evidence was insufficient on one of the two theories upon which a damage award could have been based but the verdict form did not distinguish between theories, a new

---

[8] *Sylvain v. Masonite Corp.*, 471 A.2d 1039 (Me. 1984); *Depositors Trust Co. v. Farm Family Life Insurance Co.*, 445 A.2d 1014 (Me. 1982).

10

trial was required. *Withers v. Hackett*, 1998 ME 164 ¶ 11, 714 A.2d 798. The Law Court adhered to that rule upon a second appeal in the same case. *Withers v. Hackett II*, 1999 ME 117 ¶ 5, 734 A.2d 189 (court not able to speculate as to what portion of the damages might have been awarded absent the claim that should not have gone to the jury).

This is consistent with long-established U.S. Supreme Court precedent in criminal cases. *See Black v. United* States, 561 U.S. 465, 470 (2010), *quoting Yates v. United States*, 354 U.S. 298, 312 (1957) (verdict must be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"). The court sees no basis to distinguish civil from criminal cases in this context.

Based on the final note sent out by the jury during its deliberations, it is possible to surmise that the jury verdict was based solely on the theory that the Lilley defendants were professionally negligent with respect to the tortious interference claim. However, the court cannot make that assumption. There were nine members of the jury and six who joined in the verdict. The court's answer to the jury's final note may have led a number of the jurors to decide the case based on malpractice with respect to the tortious interference claim. However, this does not rule out the possibility that at least one of the jurors who joined in the verdict was instead basing his or her vote on malpractice with respect to the IIED claim.

## Million Dollar Damage Testimony

Vaughn Sleeper testified without objection as to his opinion of the fair market value of the farm. Mary Sleeper also testified as to her opinion of the fair market value of the farm although an objection was lodged to her testimony on the ground that she had not been designated to offer that testimony. The court overruled that objection.

11

Thereafter the court allowed testimony, over Mr. MacColl's objection, that the Lilley defendants had hired Alan McCausland to offer testimony at the arbitration to the effect that the Sleepers had incurred economic damages of 1.8 million. Whether this was admissible had been the subject of considerable dispute before and during trial. The record indicates that the court was ultimately was persuaded that the $ 1.8 million damage figure was relevant because it constituted a basis for concluding that the Sleepers had a significant claim which the Lilley defendants should have vigorously pursued.

Subsequently, after further argument, the court was persuaded that the fair market value of the farm (where no evidence had been offered as to the extent that the farm was mortgaged) was not relevant to damages. It instructed the jurors that they could not consider the Sleepers' estimate as to the value of the farm real estate as a basis for awarding damages. It also gave an instruction that the McCausland figure related solely to amounts claimed, that the jury could not consider the McCausland figure as evidence of the damages incurred by the Sleepers, and that the jury had to base any award of damages on the proof submitted at the trial before them, not on amounts claimed at arbitration.

Given the court's instructions recited above, the court would not be inclined to grant a new trial based solely on the admission of the McCausland economic damage figure or the Sleepers' testimony as to market value. However, the court agrees that the Sleepers' testimony as to market value and the McCausland evidence were prejudicial to the Lilley defendants and that there is a fair possibility that, notwithstanding the court's instruction, the jury was influenced by that evidence in awarding damages. Since the McCausland damage figure was offered in the arbitration as evidence of the Sleepers' economic damages, it was wholly irrelevant to the IIED claim. And since the

12

Sleepers were only able to offer proof of $30,000 in economic damages resulting from the tortious interference claim, the McCausland figure should probably have been excluded under Rule 403 as more unfairly prejudicial than probative.

The problematic nature of the damages evidence offered in this case contributes to the court's view that a new trial is the appropriate remedy here.

## Jury Instruction as to Expert Testimony

The Lilley defendants contend that the court's jury instructions were erroneous with respect to the consideration of expert testimony. Specifically, they contend that the instructions essentially told the jury not to consider expert testimony as it related to the question of whether the Sleepers would have received a more favorable result at the arbitration but for professional negligence on the part of the Lilley defendants.

On this issue the court's written instructions were less than ideal and the court's oral instructions were erroneous.[9]

The court's written instructions stated that the jury could consider the opinions of the expert witnesses "as they bear on the issues in this case but you ultimately have to reach your own decision based on the evidence." However, this instruction was given under a topic heading relating to whether the Sleepers would have received a more favorable result at the arbitration but for negligence on the part of the Lilley defendants. No comparable instruction was given with respect to the role of expert testimony in determining whether the defendants had been professionally negligent. This could have been interpreted as a suggestion that the jury should give less weight to

[9] Once again, this is an issue which was affected by the rush to get the case to the jury before the Christmas holiday.

13

the expert testimony on the issue of causation than on the issue of professional negligence.

The court's oral instructions on this issue were intended to be the same as its written instructions.[10] However, in giving the instructions orally the court appears to have inadvertently departed from the written instructions and stated that the jury could consider expert opinions as they bear "on the issue of professional negligence" but had to reach its own decision on whether the Sleepers would have received a more favorable result. Counsel for the Lilley defendants objected to the instruction as given, but the court did not correct the oral instruction or direct the jury to the more accurate written instruction.

Maine precedent establishes that expert testimony is both relevant and necessary on the issue of whether a more favorable result would have been obtained in the absence of alleged malpractice. *See, e.g., Corey v. Norman Hanson & DeTroy*, 1999 ME 196 ¶ 14, 742 A.2d 933. To the extent that the jury instructions departed from that rule – or at the very least seriously muddied the water on that issue – this supports the conclusion that a new trial should be ordered.


Right to Jury Trial

The final issue raised by the Lilley defendants is that plaintiffs should not have been entitled to a jury trial on certain issues in the case – specifically on whether the Sleepers would likely have obtained a more favorable result from the arbitrator and the amount of damages that would have been awarded by the arbitrator in the absence of

---

[10] Except for the addition of the word "ultimately," which was added for clarity to the written instructions after a sidebar when counsel were asked for any objections or further instructions. The addition of "ultimately" was not a substantive change.

14

professional negligence by the Lilley defendants. This issue was raised by the Lilley defendants before trial, and the court disagreed at that time. However, when it issued that ruling, the court was unaware of the Law Court's decision in *Steeves v. Bernstein, Shur, Sawyer & Nelson*, 1998 ME 210, 718 A.2d 186.

The *Steeves* decision involved a claim of legal malpractice based on an allegedly negligent failure to advise the plaintiff that she could have sought protection under Chapter 11 of the bankruptcy code. The plaintiff argued that a determination of the extent to which a bankruptcy petition would have protected her should have been made by a jury, but the Law Court disagreed. Citing the Utah case of *Harline v. Barker*, 912 P.2d 433 (Utah 1996), the Court concluded that where the issues in question would have been decided by a bankruptcy judge, there would be no role for a jury in a subsequent malpractice action. 1998 ME 210 ¶¶ 17-18.

*Steeves* can be distinguished from the case at bar because the question of whether the plaintiff would have received a more favorable outcome in *Steeves* was largely a question of law, as opposed to the factual issues in this case – whether the Sleepers would have been likely to have prevailed before the arbitrator and of so, the damages the arbitrator would likely have awarded. Whether *Steeves* should in fact be distinguished on that ground, however, is not clear because of the Law Court's reliance on *Harline*, a case in which the Utah Supreme Court specifically rejected the theory that in a legal malpractice action, a jury should decide all issues on the "case within a case" unless those issues were legal rather than factual. 912 P.2d at 440. In a passage quoted by the Law Court, *Harline* stated that a party should not be able to "bootstrap" its way into having a jury decide when the underlying factual issues would have been decided by an expert judge. *Id.*, *quoted in* 1998 ME 210 ¶ 18.

15

By its terms, *Harline* applies when "the underlying case could only have been decided by a judge," 912 P.2d at 440, *quoted in* 1998 ME 210 ¶ 18, and the Sleepers argue that condition is not met in this case. On the other hand, once the federal court sent the Sleepers' case against Agway to an arbitrator with Agway having filed for bankruptcy, the Sleepers' case against Agway was only going to be decided by an arbitrator.[11]

As a practical matter, a jury was likely to be far more sympathetic to the Sleepers' emotional distress claims than an arbitrator ruling on claims brought against a bankrupt company. Although the court is a strong adherent of the right to a jury trial, it must acknowledge that it is somewhat illogical that a claimant suing a lawyer for malpractice because the lawyer did not obtain a more favorable award from an arbitrator is entitled to have a jury decide how the arbitrator would likely have ruled and the amount of damages that the arbitrator would likely have awarded.

This issue relates only to the "case within a case" aspect of a legal malpractice claim. The court cannot see any basis on which to conclude that a jury should not decide the issue of whether the Lilley defendants' handling of the case was professionally negligent. As a result, since the court has otherwise decided that the motion for a new trial should be granted, the court is inclined to have this case put on the jury list for retrial. The court will reserve the question of whether the jury should decide all issues, whether the court should be prepared to rule on the "case within a case" issues, whether there should be an advisory jury on the "case within a case" issues, or whether some other procedure should be followed to resolve the jury issue.

---

[11] As the court noted in its decision on summary judgment, the Sleepers' expert acknowledged that there was no realistic prospect of returning the case to the federal district court for a jury trial.

Conclusion

The court recognizes that there is no such thing as a perfect trial. However, this trial fell too far short. Particularly when the issues identified above are considered in combination, the court finds that the Lilley defendants have demonstrated that prejudicial error occurred at the trial. As a result, the court is constrained to find that, through no fault of the jury, there was a failure of substantial justice necessitating a new trial.

The entry shall be:

Defendants' motion for judgment as a matter of law is denied. Defendants' motion for a new trial is granted. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: June __13__, 2014

Thomas D. Warren
Justice, Superior Court

17

LEE BALS, ESQ
  -PLAINTIFF'S ATTORNEY


EDWARD MACCOLL ESQ
  -DEFENDANT'S ATTORNEY

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-006
TDW- CuM- 8/29/2013

VAUGHN SLEEPER, et al,

Plaintiffs

v.

DANIEL G. LILLEY, et al,

Defendants

STATE OF MAINE
Cumberland, ss, Clerk's Office

AUG 29 2013

RECEIVED

ORDER

Before the court is a motion by defendants Daniel G. Lilley and Daniel G. Lilley Law Offices P.A. (collectively, "the Lilley firm") for summary judgment on a claim brought against the Lilley firm for legal malpractice by Vaughn and Mary Sleeper. The Sleepers were formerly represented by the Lilley firm in a lawsuit brought against Agway Inc. and certain of its officers and employees. After various twists and turns, including Agway's successful motion to send the claims to arbitration and Agway's subsequent bankruptcy filing, the Sleepers recovered approximately $ 51,000 but contend that they would have obtained a substantially larger recovery but for the Lilley firm's professional negligence.

The Sleepers' complaint originally included claims for breach of fiduciary duty and negligent infliction of emotional distress as well as a claim for attorney malpractice. However, the court previously dismissed the Sleepers' negligent infliction claim, and the Sleepers now concede that their claim for breach of fiduciary duty should also be dismissed. Plaintiffs' Memorandum in opposition to Summary Judgment dated April 12, 2013 at 2. Plaintiffs' professional negligence claim remains to be resolved.

## 1. Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99 ¶ 8, 800 A.2d 702. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924.

The Law Court has also ruled that to resist a summary judgment motion, a plaintiff must establish a prima facie case for each element of his cause of action. E.g., Lougee Conservancy v. CitiMortgage Inc., 2012 ME 103 ¶ 12, 48 A.3d 774. However, in Corey v. Norman Hanson & DeTroy, 1999 ME 196 ¶ 9, 742 A.2d 933, the Law Court clarified that the plaintiff's burden to establish a prima facie case only applies to those elements of the plaintiff's case that have been challenged by the defendant's summary judgment motion. Unless a defendant has first offered facts supported by record references that would negate one or more elements of the plaintiff's cause of action, the plaintiff is not required to controvert those facts.

This is significant in the instant case because, although defendants fault the Sleepers for not establishing a prima facie case on all the elements of their professional negligence claim, defendants' statement of material facts does not offer evidence to challenge certain of the specific elements of the Sleepers' claim. On those issues

2

summary judgment cannot be granted despite any potential weakness of plaintiffs' opposition.

At the same time the court fully agrees with defendants that the Sleepers cannot rely on an unsworn expert designation to raise disputed issues for trial when they have not submitted relevant sworn testimony from their expert either by affidavit or deposition. Similarly, on issues requiring expert testimony,[1] plaintiffs are not entitled to rely on the affidavit of Vaughn Sleeper.

Paragraph 40 of defendants' statement of material facts (SMF) asserts that the Lilley firm's representation of the Sleepers met the appropriate standard of care based on a general statement in the affidavit of Christian Foster (an attorney at the Lilley firm) to that effect. Arguably, the Sleepers' failure to controvert that particular paragraph – except by citations to their unsworn expert designation and to statements in Vaughn Sleeper's affidavit that cannot substitute for expert testimony – could form a basis for summary judgment against them. That would not, however, square with the summary judgment record as a whole.

Moreover, while the court agrees that expert testimony may be necessary to controvert sworn testimony by Attorney Foster as to the reasonableness of specific decisions made by the Lilley firm (see, e.g., Defendants' December 12, 2012 SMF ¶ 27), the court is unwilling to conclude that a general and conclusory testimony by Attorney Foster that his conduct and the conduct of his firm met the applicable standard of care is a sufficient basis for summary judgment.

---

[1] Where legal malpractice claims have been raised, expert testimony is required in most cases to establish the appropriate standard of care and that the attorney breached that standard of care. See Kurtz & Perry P.A. v. Emerson, 2010 ME 107 ¶ 26, 8 A.3d 677.

3

## 2. Elements of Legal Malpractice Claim

To prove that the Lilley firm committed attorney malpractice or professional negligence, the Sleepers must prove (1) that the law firm breached the applicable standard of conduct with respect to its handling of their case against Agway and (2) that the breach was a legal cause of injury to the Sleepers – i.e., that they would have received a more favorable decision in the Agway case if the Lilley firm had not committed professional negligence in the handling of their claims. See Corey v. Norman Hanson & DeTroy, 1999 ME 196 ¶¶ 10, 13.

In cases where attorney malpractice is based on an alleged "failure to plead" claims that should have been asserted, a plaintiff has to demonstrate on summary judgment that there are sufficient facts to allow a jury to conclude that (1) the attorney was negligent in failing to assert the claims in question; (2) that his negligence caused the client to lose an opportunity to achieve a favorable result (3) which would have been allowed by the applicable law and (4) which would have been supported by the facts. Niehoff v. Shankman & Associates Legal Center P.A., 2000 ME 214 ¶ 10, 763 A.2d 121.

The Sleepers argue that the Lilley firm was negligent in pursuing claims of antitrust violations, tortious interference with advantageous economic relations, and defamation. All of those claims were in fact set forth in the complaint that Lilley filed on behalf of the Sleepers against Agway. See Exhibit C to the December 10, 2012 affidavit of Christian Foster. As a result, this is not strictly a "failure to plead " case.[2] Instead, the

---

[2] The only exception involves the Sleepers' apparent contention that the Lilley firm should have included a common law "unfair competition" claim against Agway. Plaintiffs' Memorandum in Opposition to Summary Judgment dated April 12, 2013 ("Plaintiffs' April 12, 2013 Memorandum") at 26. However, the only common law unfair competition claim that has been recognized in Maine involves the appropriation of a trade name. See Hubbard v. Nisbet, 159 Me. 406, 193 A.2d 850 (1963). The Sleepers cite FTC v. Sperry & Hutchinson Co., 405 U.S. 233

4

Sleepers argue that the Lilley firm negligently prosecuted the antitrust, tortious interference, and defamation claims set forth in the complaint, in part because Lilley allegedly perceived those claims as being speculative. See Plaintiffs' April 12, 2013 Memorandum at 16-17.

Even if the Niehoff "failure to plead" standard does not apply here, that standard is not materially different from the basic standard set forth in Corey v. Norman Hanson & DeTroy. Thus, if a claim is not legally or factually viable, it follows that the attorney cannot have been negligent in failing to pursue that claim and that the claim would not have produced a favorable result. The Lilley firm's summary judgment motion is premised on the contention that the antitrust, tortious interference, and defamation claims on which the Sleepers base their claim of professional negligence were not legally and factually viable.

## 3. Antitrust

The Sleepers argue that the Lilley firm negligently failed to pursue federal and state antitrust claims based on an alleged refusal to deal by Agway and on Agway's alleged involvement in a boycott that the Sleepers contend constituted a conspiracy in restraint of trade.[3] As defendants' papers demonstrate, there are numerous potential problems with the antitrust claims that the Sleepers contend the Lilley firm failed to

---

(1972), but that was an enforcement case brought under the FTC statute. Maine's Unfair Trade Practice Act was not available here because that statute only provides a remedy to persons who purchase or lease goods or services for personal, family or household purposes. 5 M.R.S. § 213(1). The defendants are therefore entitled to summary judgment on the Sleepers' claim that they negligently failed to assert a common law claim of unfair competition.

[3] The only material difference between state and federal antitrust laws is that the former do not require an effect on interstate commerce. In terms of their substantive prohibitions, the Maine antitrust statutes, 10 M.R.S. §§ 1101-04, parallel the federal antitrust statute in all respects pertinent to this case. Tri-State Rubbish Inc. v. Waste Management Inc., 998 F.2d 1073, 1081 (1st Cir. 1993).

5

adequately pursue. However, the court concludes that the summary judgment record does not establish that there are no genuine disputes for trial as to the Sleepers' ability to prevail on those claims.

The Sleepers' claim involving an alleged refusal to deal would require the Sleepers to show that Agway exercised monopoly power and that it refused to deal with the Sleepers for anticompetitive motives. Defendants' statement of material facts does not offer evidence as to Agway's absence of monopoly power, so the Sleepers cannot be faulted for their failure to submit any admissible evidence that Agway did possess monopoly power.[4] Moreover, to the extent that the parties have addressed anticompetitive motivation, that issue presents a disputed issue for trial.

Similarly, the Sleepers have offered just enough evidence, construed in the light most favorable to the Sleepers as the party opposing summary judgment, to demonstrate the existence of a factual issue for trial on a boycott/concerted refusal to deal claim. See Ronald Barnes Aff. ¶¶ 4-5. While the court doubts the Sleepers' apparent contention that parties can "unwittingly" enter into an agreement in restraint of trade, an agreement secured by alleged intimidation would be cognizable under the antitrust laws.

On the Sleepers' claim that the Lilley firm negligently failed to prosecute their antitrust claims, therefore, summary judgment is denied.

4. Tortious Interference with Prospective Economic Advantage

To prevail against Agway on a claim of tortious interference with a prospective economic advantage, the Sleepers would have been required to prove (1) that a valid

---

[4] Notwithstanding the Sleepers' contention in their memorandum that Agway's monopoly position is "undisputed," there appears to be a considerable dispute as to this issue.

6

contract or prospective advantage existed; (2) that Agway interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages. Rutland v. Mullen, 2002 ME 98 ¶ 13, 798 A.2d 1104. The Sleepers' argument is that Agway interfered through intimidation with the Sleepers' ability to sell to Agway's contract growers. See Plaintiff's April 12, 2013 Memorandum at 30. Although defendants have offered substantial evidence to contradict that claim, the Ronald Barnes affidavit is sufficient to raise a factual dispute for trial on that issue.

Moreover, although the Barnes Affidavit demonstrates that he, as well as the other contract growers, was eventually able to obtain seed potatoes from the Sleepers through an intermediary, the Sleepers have offered evidence that this resulted in a financial loss to the Sleepers. See Plaintiffs' SMF ¶ 64.

Summary judgment is therefore denied on the Sleepers' claim that the Lilley firm committed professional negligence with respect to the Sleepers' claim against Agway for tortious interference.


5. Defamation

The Sleepers' defamation claim is based on the contention that Agway falsely informed Howard Giberson that potatoes delivered to Giberson by Sleeper Farms in 1999 contained a mixture of genetically modified seed potatoes ("GM seed potatoes") and non-GM seed potatoes. The first problem with this claim is that defendants' submissions demonstrate that on a number of occasions during the course of the litigation against Agway, Vaughn Sleeper acknowledged that he had in fact delivered a mixed load of GM and non-GM seed potatoes to Giberson. See Badger Affidavit ¶¶ 12-14 and annexed exhibits L through O.

7

At that time Sleeper contended that he had delivered the mixed load because he had been instructed to do so by Agway. However, Sleeper now contends that he always believed that none of the potatoes delivered to Giberson in 1999 were GM potatoes and that he had told attorneys at the Lilley firm that he had not delivered a mixed load. However, given Sleeper's prior admissions that he had delivered a mixed load containing some GM seed potatoes to Giberson, several of which were under oath,[5] it would appear impossible for the Lilley firm to have reversed course and contended that Sleeper Farms did not deliver any GM seed potatoes to Giberson in 1999.

That is particularly true given that Sleeper testified that he changed his mind based on documents that were produced for the first time at the arbitration in August 2005. Vaughn Sleeper Dep. 280. The Lilley firm cannot have been expected to pursue a claim for defamation based on information that Sleeper did not learn until the very end of the case – after he had already testified to the contrary under oath.[6]

Even aside from this issue and even assuming that any statement that Sleeper delivered a mixed load containing some GM seed potatoes to Giberson in 1999 would have been false, the Sleepers have offered no evidence to controvert defendants' showing that there is no evidence that Agway ever made such a statement to Giberson or to anyone else. See Defendants' SMF dated December 12, 2012 ¶¶ 11-13. Although the Sleepers have denied ¶¶ 11-13 in their statement of material facts, they have no direct or admissible evidence that Agway made any such statements, and the evidence they cite  – including unsupported and inadmissible speculation by Vaughn Sleeper –

---

[5] See Badger Aff. Exs. L and M.

[6] The parties dispute the admissibility of certain documents which Vaughn Sleeper contends support his change of testimony as to whether he delivered a mixed load of GM and non-GM seed potatoes to Giberson. The court agrees with defendants that the documents in question are unauthenticated hearsay but does not base its ruling on that ground.

8

does not support any inference that such statements were made and is insufficient to create a disputed issue for trial on that issue.

As a result, defendants are entitled to summary judgment dismissing the Sleepers' claims of professional negligence with respect to defamation claims against Agway.[7]


6. Arbitration and Discovery

The Sleepers contend that the Lilley firm was professionally negligent in submitting all of the Sleepers' claims to arbitration rather than seeking to have the arbitrator send certain claims back to the federal district court. In response to defendants' evidence that this was a reasonable decision to which the Sleepers consented, see Defendants' December 12, 2013 SMF ¶¶ 26-27, the Sleepers cite to Vaughn Sleeper's testimony that he had wanted a jury trial and only consented to arbitration based on advice from lawyers at the Lilley firm. However, this does not raise a disputed issue for trial as to whether the Lilley firm's advice was negligent based on the circumstances existing at the time – given that Judge Singal had already referred the case to arbitration and Agway had thereafter filed for bankruptcy.

The Sleepers also rely on deposition testimony from their designated expert criticizing the decision not to request that the arbitrator send back certain claims to the district court. Crouter Dep. 116. Two pages later in his deposition, however, after being reminded that Agway was already in bankruptcy by that point, the Sleepers' expert

---

[7] The court is not suggesting that evidence as to the composition of the potatoes delivered to Giberson in 1999 might not be relevant to other issues, including the antitrust claims, only that the Sleepers are precluded from asserting that the Lilley firm was professionally negligent in not pursuing a defamation claim based on whether the load delivered to Giberson in 1999 included GM potatoes.

acknowledged that sending the case back to the district court would not have been possible. Id. 118.

As a result, the Sleepers have not adequately controverted defendants' showing on this issue, and defendants are entitled to summary judgment with respect to the Sleepers' claim of professional negligence based on the decision to submit their entire claim to arbitration.

Similarly, the Sleepers have not adequately controverted the Lilley firm's showing that it diligently pursued discovery. See Defendants' December 12, 2012 SMF ¶ 29. Plaintiffs' reliance on Vaughn Sleeper's interrogatory answers, which are conclusory and which cannot substitute for expert testimony, are insufficient to preclude summary judgment for defendants with respect to the Sleepers' allegations of negligence with respect to discovery.


7. Damages

Defendants finally contend that summary judgment should be granted on the Sleepers' professional negligence claims because the Sleepers have shown no evidence of damages. The defendants are correct that claims filed by the Lilley firm on behalf of the Sleepers in the bankruptcy case do not constitute admissible evidence as to damages. They are also correct that the Sleepers do not have any expert testimony to support their damage claim.

Allen McCausland had been designated as a damages expert by the Lilley firm in the underlying case against Agway. Apparently without notifying or retaining him in advance, the Sleepers then designated McCausland as their expert in this case. However, McCausland's earlier report is inadmissible hearsay, and McCausland is

10

either unable or unwilling (or both) to substantiate his prior calculations or to offer any expert testimony relating to the Sleepers alleged damages.

This may present a significant obstacle at trial, but there is at least some evidence of damages sufficient to avoid summary judgment based on an inability to prove damages. The evidence offered by the Sleepers that they incurred a financial loss in selling potatoes to Maine Potato Growers as an intermediary, Plaintiffs' SMF ¶ 64, is itself sufficient to generate a factual issue with respect to damages for purposes of summary judgment.

The entry shall be:

Defendants' Motion for Summary Judgment is granted as to Count II of the complaint and is granted in certain respects with respect to Count I. Specifically, on Count I the court grants summary judgment on plaintiffs' claims of professional negligence with respect to the specific claims identified in this order. On the remaining aspects of Count I, Defendants' motion for summary judgment is denied.

The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: August 29, 2013

Thomas D. Warren
Justice, Superior Court

11